Ronnie Griffin
# 50113-086
F.C.I. Butner II
P.O. Box 1500
Butner, N.C.  27509

Clerk of the U.S. District Court
700 Stewart Street
Room 6301
Seattle, Washington  98101-1271

January 14th, 2026

Received From
SEATTLE

FEB 03 2026

Re: USA v. Ronnie Griffin
Case No: 3:23-CR-5085-DGE-21:
Honorable David G. Estudillo:

Dear Clerk of Court,

   Please find enclosed Package  2  of Two, my motion for Compassionate Re-
lease, and or my Exhibits for same. Due to the rules and regulations that
this Institution is now implementing; it is easier to send all of this in
two packages instead of one, due to the weight involved and the process in-
volved in sending legal mail in excess of 1 pound.

   Both packages have been sent at the same time, on the same day, from here
at Butner Two, F.C.I., Butner, N.C. Furthermore, I would like to request the
following from your office, as well as the United States Attorney's Office:
That being that; any notifications from your office, or Orders from the Court,
Any Opposition from the U.S. Attorney's Office, etc. regarding this matter,
be sent to me via Certifified Mail. ... The reason being that there is a
significant delay in receiving mail here at Butner II F.C.I., due to the in-
flux of illicit contraband coming into the Institution. Thus mail is delayed
due to it being x-rayed and slowly inspected; which includes Legal Mail.

   Thus, I do not want to be time barred, as this Institution is consistently
locking down, (due primarily to shortage of staff) and therefore, it closes
its legal library, for me to compile an intelligent response, etc.

   I would be most thankful, if you would make the Court aware of this situa-
tion, as well as the A.U.S.A. Please let me know that you have received both
packages, regarding this motion. Thank you for your assistance, notations,
and consideration in this matter.

                                              Respectfully,

                                              Ronnie Griffin

Exhibits Attached:

Exhibits A1-A5:    .......... Copies of the initial Submission to Warden Leu, per policy and Statute; given to Case Manager Jarvis at Mainline on 11/26/25:

Exhibits B1-B4:    .......... Clinical notes from Duke University Hospital, in re: of Mr. Griffin; Primary Diagnosis for Peripheral Artery Disease, as well as listing the Abdominal Aortic Aneurysm and Griffin's leg conditions:

Exhibits C1-C2:    .......... A medical listing of Mr. Griffin's current and ongoing medical conditions, here at Butner FCI II.

Exhibits D1-D3:    .......... An Affidavit presented by Griffin's Cellmate, whom is Caregiver to Mr. Griffin, as well as to prison safety and health conditions here at Butner FCI II:

Exhibits E1-E3:    .......... Medical records re: 09/13/25, health issue, where Griffin's BP was 200/112; as well as EKG records:

Exhibits F1-F25:   .......... Copies of Mr. Griffin's medical record showing certain errors as well as his health issues:

Exhibits G1-G2:    .......... Pictures of Mr. Griffins Amputated Toe, on his right foot affecting his mobility:

Exhibit  H1:       .......... Medical form filled out by Dr. Rogers recognizing the need for Giffin's treatment of Chronic Hepatitis 'C', but as of 12/25/25; still has not been treated:

Exhibits I1-I3:    .......... Copy of News Article, published by 'The Remedy Project', in reference to Dr. Patrick Craft.

Exhibits J1-J21:   .......... Declaration of Mr. Phillip Wise, (Assistant Director of The Federal Bureau of Prisons) (ex-employee) attesting to the Bureau's Health Care System:

Exhibits K1-K9:    .......... Complete copy of the NPR (National Public Radio) Interview, in reference of the deaths occuring here at the complex at Butner, N.C.

Exhibits L1-L3:    .......... News Article from: The Raleigh News Observer, in re: of Safety and Health Conditions here at F.C.I. Butner 2:

Exhibits M1-M9:    .......... Copies of Attempts made by Griffin, at Sea-Tac, as well e-mails trying to get Medical Assistance:

Exhibits N1-N2:    .......... News Article from: The Seattle Times, reporting on the serious lack of medical treatment to inmates at Sea-Tac.

Exhibit  O1:       .......... Copy of Notice, from the FCI Butner's Dental Dept.

Exhibits P1-P__:   .......... Copies of Letters of Support for Ronnie Griffin:

Exhibit  Q1:       .......... Memorandum from Unit Manager Jarvis, regarding the fact that Mr. Griffin had/has not received any response from his Reduction in Sentence Submission. Note: ** The actual date that Mr. Griffin submitted to Unit Manager Jarvis was indeed 11/26/25. Nonetheless, thirty (30) days have passed.

Exhibit A-1:

REQUEST FOR A REDUCTION IN SENTENCE
AND OR COMPASSIONATE RELEASE
PURSUANT TO § 3582(c)(1)(A)(i);
AND THE NEW U.S.S.C. AMENDED GUIDELINES
BECOMING LAW, AS OF NOVEMBER 1st, 2023:

SUBMITTED ON THE BEHALF OF:

Ronnie Griffin

FEDERAL I.D. NUMBER:

# 50113-086

PRESENTED TO F.C.I. BUTNER 2, STAFF MEMBER:

Unit Manager Jarvis:

AS BEING A DESIGNATED REPRESENTATIVE OF THE WARDEN:

ON THIS  26  DAY OF November, 2025:

COVER SHEET:

Exhibit A-2:

## COMPASSIONATE RELEASE:

### REQUEST FOR A REDUCTION IN SENTENCE / COMPASSIONATE RELEASE:
### AS PURSUANT TO THE STATUTORY PROVISIONS OF
### 18 U.S.C. § 3582(c)(1)(A)(i):

" A motion for a modification of a sentence will be made to the sentencing court, only in particular 'extraordinary and compelling circumstances, that could not reasonably have been foreseen by the Court at the time of sentencing."

Federal law provides that a court can reduce a term of imprisonment in certain cases. This is found in Title 18 of the United States Code Section 3582(c)(1), commonly known as the 'Compassionate Release' statute. The First Step Act of 2018, gave inmates the right to petition the Courts directly for 'compassionate release,' due to the fact that the Federal Bureau of Prisons were not recommending but a very small handful of compassionate releases be granted by the Court. As a result, part of the statute reads as follows:

(A) The Court, upon motion of the Director of the Bureau of Prisons or upon motion of the defendant, after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf, or the lapse of 30 days, from the receipt of such request by the Warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in Section 3553(a) to the extent that they are applicable, if it finds that;

(i) extraordinary and compelling reasons warrant such a reduction:

Thus far, F.C.I. Butner (2), has previously mentioned that this Administration is only considering, ... ** Terminal Medical Conditions; ** Debilitated Medical Conditions; ** Elderly Inmates; ** Death or Incapacitation of a Family Member, (only) such as: Spouse or Child.

Furthermore, F.C.I. Butner (2), is also currently stating that, 'Reviews of requests that are not based on the criteria set forth in Program Statement 5050.50,' are not meeting their standards. ... F.C.I. Butner (2), is therefore not adhering to the § 3582(c)(1) statute pursuant to the new change in the law. The new amendments broadens the definition of 'extraordinary and compelling' reasons, as expanding the categories and sub-categories beyond the current B.O.P. Policy.

The United States Sentencing Commission is the governing body of what is allowed and not allowed within the §3582(c)(1)(A)(i) statute. By not considering these new amendments, F.C.I. Butner (2), and the Bureau of Prisons as a whole, are showing contempt for the law, as well as being disingenuous as it relates to 'considering' an inmate's request for a Reduction in Sentence.

(-1-)

Not only have there been new sub-sections added onto the existing Sections, such as (b)(1) Medical Circumstances of the Defendant, but the Section (2), (i.e.) Age of the Defendant, has also been changed. Additionally, Section (3), (i.e.) Family Circustances of the Defendant, has also been revised to include one's parent or immediate family member. (such as grandparents).

Similarily, other new sections for considerations also include: (6), Unusually Long Sentence; with a sub-section referred to as: Limitation on Changes· in Law. Yet, F.C.I. Butner (2), has yet to address these new amendments, utilizing the excuse that 'they are relying on Policy statement 5050.50, which is dated January 17, 2019. This has been the normal practice of the Federal Bureau of Prisons regarding it's program statements; as they are grossly outdated, going back to Directors whom were installed back in 1999. These outdated program statements no longer reflect the current penal interests or concerns within the Bureau of Prisons.

Also, is the fact, that in some Circuits, (District Courts) the Assistant United States Attorney's Office argues that during this particular process, (i.e.) the submission to the Warden, must include more portions of the defendant's circumstances than that of which the B.O.P. seeks to address. This dis-connect of what and what not, the B.O.P. wishes to address and acknowledge, shows not only bias towards the inmate, but also goes to show how unjust the B.O.P. acts.

As indicated by the new amended guidelines set forth by the U.S.S.C. and becoming law as of November 1st, 2023, and approved by Congress; the defendant presents the following extraordinary and compelling reasoning which warrants consideration.

A. As per § 1B1.13(b)(1)(B); as it pertains to the "Medical Circumstances of the Defendant", Mr. Griffin meets the criteria of this Sub-section. Amongst the numerous medical conditions that Mr. Griffin currently has, they include but are not limited to: Neuropathy; (A disorder affecting the nervous system); COPD, -- (Chronic Obstructive Pulmonary Disease); AAA > (Abdominable Aortic Anuerysm); A-Fib, Diabetes, Extremely High Blood Pressure, Nerve Damage in Right Arm, Torn Rotary Cuff, Memory Loss, Hearing Loss, Extreme Dental Issues, and due to lack of timely medical care, has had some of his toes removed. (Amputated). Mr. Griffin has had significant issues with having open wounds on his legs, which until just recently received medical attention, after having to file an Administrative Remedy. Thus, these are a few of the medical issues that Mr. Griffin has, and has extreme difficulty in dealing with in the setting of a Correctional Institutional setting. ... B. Mr. Griffin also meets the criteria for an additional Sub-section, that being Sub-section (C), of the new U.S.S.G. Amended Guidelines. Which reads as such: "The defendant is suffering from a medical condition that requires long-term or specialized medical care that is not being

Exhibit A-4:

provided and without which the defendant is at risk of serious deteriration in health or death." C. Mr. Griffin also meets the Age Requirement under Section (2) of the new amended guidelines pursuant to § 3582(c)(1)(A)(i). >>> D. Mr. Griffin meets the criteria set forth under "Other Reasons" for reasons including but not limited to: Harsh Prison Conditions; Unappropriate Training of Staff; Staff Corruption and Improper Behavior; An Uncontrollable Drug Problem; Infra- structure issues; Health and Safety Issues, (such as Black Mold, filthy Air Ducts, Brown drinking water, etc.); Consistent Lockdowns; Staff shortages; Recreational closings; Toliet paper issues; A broken Administrative Remedy Procedure; A signi- ficant delay in the U.S.P.S. Mail, (despite BOP Policy); Being placed more than 500 miles away from my home; Being in a facility where within the whole BOP sys- tem, 1 in 4 deaths happen; Having a Doctor on staff, (1 of 2) whom is referred to as "Dr. Death" and has been placed in the past on Probation by the Virginia Board of Medicine; Misuse of Federal funds for the Institution I am currently placed at; No reasonable nor realistic rehabilitative programming available; Unsanitary Plumbing Facilities; And until recently, having to rely on a Diesel Powered Generator to run the electrical system in Mr. Griffin's housing unit. These are but a few of the "Other Reasons" of which constitute 'extraordinary and compelling' reasonings. Mr. Griffin also meets the criteria regarding: Rehabilitation. Alone, it cannot be considered, however, in combination with any other reason, it may be used for consideration. Mr. Griffin has an 'incident free' record receiving no disciplinary infractions since his incarceration. Due to his medical condition, it is extremely hard for him to move about.

I, ___Ronnie Griffin___, an inmate currently residing at F.C.I. Butner (2), do hereby swear under the penalty of perjury and certify that on the 26 day of November , 2025; I presented this submission to staff member: Unit Mgr. Jarvis, as being a duly designated representative of the Warden of FCI Butner 2.

Signed by:

Ronnie Griffin
# 50113-086

(-3-)

Exhibit A-5:

## REQUIRED SUBMISSION INFORMATION:

Name: ........................ Ronnie Griffin

Number: ...................... # 50113-086

Date of Birth: ............ ███████

Current Age: ............... 67

Case Manager: ............. Ms. Martinez

Unit Manager: ............. Mr. Jarvis

Original Offense(s) ......... 21 U.S.C. § 841(A)(1); 21 U.S.C. § 841(B)(1)(B); and 21 U.S.C. § 846: 'Conspiracy to Distribute Controlled Substances'.

Case Number: ................ 3:23-CR-5085-DGE-21:

Court of Jurisdiction: Western District of Washington

Sentencing Judge: Judge Estudillo

Sentencing Date: 12/12/24

Sentence Imposed: 75 Months

Supevised Release Term: 5 years

Prpjected Release Date: 05/02/28 (Projected Satisfaction Date)

Total Good Time Earned: 108 days

Age at Time of Sentencing: 65

Release Address Information for the United States Probation Office:

I seek to reside at:...... 12020 5th Avenue N.E., in Seattle, Washington

Relationship of Party: ... Jeffery Stephens (Good Friend)

Phone Number: .............

Employment Plans: I will no doubt be drawing disability, due to my Medical Condition, unless I can find something of interest to do at home on the computer.

Medical Information: ..... Medicaid

(-4-)

Exhibit B-1:

Griffin, Ronnie (MR # D3885427) DOB: ████    Encounter Date: 08/07/2025        50113- 086   BTF

| CSN | MRN |
|---|---|
| **390953645** | **D3885427** |

# Griffin, Ronnie

MRN: D3885427

| **Initial consult** | Provider: Minc, Samantha Danielle, MD (Vascular Surgery) |
|---|---|
| 8/7/2025 | Primary diagnosis: PAD (peripheral artery disease) () |
| Vascular Access | Reason for Visit: New Patient 🅑; Referred by Rodriguez-Irizarry, Odalys, NP |

## 🗐 Progress Notes

Minc, Samantha Danielle, MD (Physician) • Vascular Surgery

 **Duke** Surgery

Division of Vascular & Endovascular Surgery

## Clinic Note

**Referring Practitoner:** Rodriguez-Irizarry, Odalys, NP
OLD HWY 75
BUTNER, NC 27509
**Reason for Visit:**
**Chief Complaint**
Patient presents with:
• New Patient
  PAD

### HPI
Ronnie Griffin is a 66 y.o. male who presents for evaluation for leg wounds. He has a history of DM2, HTN, AAA (possibly scanned last year), afib on anticoagulation, COPD, HCV, hypothyroidism, who presents for evaluation of non healing wound to lower leg. The patient has a history of edema related leg ulcers of the BLE with blistering and eventually healing. He states he uses compression but has a hard time putting them on and off. He denies venous procedures. He does have history of a DVT on the left side after hip surgery. He has had numerous foot ulcers related to his diabetic neuropathy and currently has a plantar wound on the left foot and toe tip ulcers bilaterally. He has been treated by a podiatrist in the past, but not here.

Patient reports that he quit smoking about 40 years ago. His smoking use included cigarettes. He started smoking about 2 years ago. He has never used smokeless tobacco.

### 🗐 Orders Placed

US abdominal aorta

Ambulatory Referral to Vascular Surgery Pending Review

Compression stockings

### 🍸 Medication Changes

None

### ⚕ Visit Diagnoses

◆ PAD (peripheral artery disease) Ø I73.9

Varicose veins of both lower extremities with complications I83.893

Abdominal aortic aneurysm (AAA) without rupture, unspecified part Ø I71.40

### ⬅️ Discharge

Discharge Orders
US abdominal aorta

Duke Health:Griffin, Ronnie (MRN D3885427) Printed by [AML124] at 8/8/2025 10:43 AM

Exhibit B-2:

Griffin, Ronnie (MR # D3885427) DOB [REDACTED]    Encounter Date: 08/07/2025

## Medical History

### Social History

Tobacco Use
Smoking Status        Former
• Types:              Cigarettes
• Start date:         2023
• Quit date:          8/7/1985
• Years since         40.0
  quitting:
Smokeless             Never
Tobacco

### Past Medical History:

Diagnosis                                              Date
• Arthritis
• Asthma, unspecified asthma severity, unspecified
  whether complicated, unspecified whether persistent
  (HHS-HCC)
• COPD (chronic obstructive pulmonary disease)
  (CMS/HHS-HCC)
• Diabetes mellitus without complication (CMS/HHS-
  HCC)
• History of stroke
• Substance abuse (CMS/HHS-HCC)
• Thyroid disease

Current Outpatient Medications:
• albuterol MDI, PROVENTIL, VENTOLIN, PROAIR, HFA 90
  mcg/actuation Inhaler, Inhale 2 inhalations into the lungs, Disp: , Rfl:
• apixaban (ELIQUIS) 5 mg tablet, Take 5 mg by mouth every 12
  (twelve) hours, Disp: , Rfl:
• atorvastatin (LIPITOR) 40 MG tablet, Take 40 mg by mouth once
  daily, Disp: , Rfl:
• glucose chew tablet 4 gram chewable tablet, Take 4 tablets by
  mouth as needed for Low blood sugar, Disp: , Rfl:
• insulin NPH (HUMULIN N PEN) pen injector (concentration 100
  units/mL), Inject subcutaneously 2 (two) times daily before meals,
  Disp: , Rfl:
• levothyroxine (SYNTHROID) 50 MCG tablet, Take 50 mcg by
  mouth once daily Take on an empty stomach with a glass of water at
  least 30-60 minutes before breakfast., Disp: , Rfl:
• lidocaine (LIDODERM) 5 % patch, Place 1 patch onto the skin
  daily Apply patch to the most painful area for up to 12 hours in a 24
  hour period., Disp: , Rfl:
• lisinopril (ZESTRIL) 10 MG tablet, Take 10 mg by mouth once
  daily, Disp: , Rfl:
• mometasone (ASMANEX TWISTHALER) 220 mcg/ actuation
  (120) Inhaler, Inhale 1 Puff into the lungs, Disp: , Rfl:
• nitroGLYcerin (NITROSTAT) 0.4 MG SL tablet, Place 0.4 mg under
  the tongue every 5 (five) minutes as needed for Chest pain May take
  up to 3 doses., Disp: , Rfl:

Griffin, Ronnie (MR # D3885427) DOB ████████ Encounter Date: 08/07/2025



## Assessment/Plan

Mr. Griffin is a 66 y.o. male with BLE chronic edema and wounds, and diabetic neuopathy with foot changes and chronic ulcers

1) Patient seen with my podiatry colleague, Dr. Wamelink, who feels that patient would be a candidate for diabetic footwear and possible podiatric intervention to improve his foot deformities to heel his foot wounds.
2) Will refer to Dan Geerson and the vascular surgery leg swelling clinic for evaluation for venous insufficiency and lymphedema
3) Recommend at minimum 20-30mmHg compression for edema control and wound care with compression to heal leg ulcers. (Prescribed)
4) Patient mentions that he has a known AAA. Recommend aortic ultrasound for surveillance asap.

Questions were welcomed and answered. Patient verbalized understanding and feels comfortable reaching out to us if there are any further questions on concerns.

Exhibit B-4:

Griffin, Ronnie (MR # D3885427) DOB: ███    Encounter Date: 08/07/2025



## Vascular Exam

|  | Right | Left |
|---|---|---|
| Dorsalis Pedis | 2+ | 2+ |
| Posterior Tibial | 2+ | 2+ |

T= triphasic signal, B= biphasic signal, M= monophasic signal

**DATA:**
I independently reviewed and interpreted the images.

**DIAGNOSTIC STUDIES REVIEWED:**
Normal arterial perfusion. Right first toe amputation.

Duke Health:Griffin, Ronnie (MRN D3885427) Printed by [AML124] at 8/8/2025 10:43 AM

| Reg #: 50113-086 | | | Inmate Name: GRIFFIN, RONNIE | | | |

| Description | Axis | Code Type | Code | Diag. Date | Status | Status Date |
|---|---|---|---|---|---|---|
| **Current** | | | | | | |
| LTBI No Prophy Indicated | | | | | | |
| 03/27/2023 03:19 EST  Pedersen, Dean ARNP | III | ICD-10 | 795.5C | 03/25/2023 | Current | |
| Chronic viral hepatitis C | | | | | | |
| 04/23/2025 09:35 EST  Rogers, Richard (MOUD) MD | | ICD-10 | B182 | 06/23/2023 | Current | |
| Will need to treat | | | | | | |
| 06/23/2023 22:00 EST  Dy, Maria Luisa (MAT) MD | | ICD-10 | B182 | 06/23/2023 | Current | |
| Hypothyroidism | | | | | | |
| 04/23/2025 09:35 EST  Rogers, Richard (MOUD) MD | | ICD-10 | E039 | 06/23/2023 | Current | |
| Continue TRT | | | | | | |
| 06/23/2023 22:00 EST  Dy, Maria Luisa (MAT) MD | | ICD-10 | E039 | 06/23/2023 | Current | |
| Type 2 diabetes mellitus with diabetic neuropathy | | | | | | |
| 04/23/2025 09:38 EST  Rogers, Richard (MOUD) MD | | ICD-10 | E1140 | 05/10/2024 | Current | |
| HbA1c 5.4% (12/19/24) | | | | | | |
| 05/10/2024 09:31 EST  Durano, Giles (MOUD) ARNP | | ICD-10 | E1140 | 05/10/2024 | Current | |
| Type 2 diabetes mellitus | | | | | | |
| 05/01/2023 12:46 EST  Durano, Giles (MAT) ARNP | | ICD-10 | E119 | 05/01/2023 | Current | |
| Other specified diabetes mellitus with foot ulcer | | | | | | |
| 09/21/2023 23:04 EST  Durano, Giles (MAT) ARNP | | ICD-10 | E13621 | 09/21/2023 | Current | |
| Major depressive disorder, single episode | | | | | | |
| 10/16/2023 16:39 EST  Haven, Grant (MAT) MD | | ICD-10 | F329 | 10/16/2023 | Current | |
| Age-related cataract | | | | | | |
| 09/26/2023 13:39 EST  Nelson, Tyler OD/Optometrist | | ICD-10 | H259 | 09/26/2023 | Current | |
| Myopia | | | | | | |
| 09/26/2023 13:39 EST  Nelson, Tyler OD/Optometrist | | ICD-10 | H5210 | 09/26/2023 | Current | |
| Astigmatism | | | | | | |
| 09/26/2023 13:39 EST  Nelson, Tyler OD/Optometrist | | ICD-10 | H52209 | 09/26/2023 | Current | |
| Presbyopia | | | | | | |

Case 3:23-cr-05085-DGE   Document 1488   Filed 01/29/26   Page 12 of 100

Exhibit C-1:

| Description | Axis | Code Type | Code | Diag. Date | Status | Status Date |
|---|---|---|---|---|---|---|
| 09/26/2023 13:39 EST  Nelson, Tyler OD/Optometrist | | ICD-10 | H524 | 09/26/2023 | Current | |
| Essential (primary) hypertension | | | | | | |
| 09/26/2025 13:42 EST  Rodriguez Irizarry, O. (MOUD) NP-C | | ICD-10 | I10 | 06/07/2023 | Current | |
| BP appropriate on current regimen, continue with no changes | | | | | | |
| 04/23/2025 09:38 EST  Rogers, Richard (MOUD) MD | | ICD-10 | I10 | 06/07/2023 | Current | |
| BP appropriate on current regimen, continue with no changes | | | | | | |
| 06/07/2023 17:18 EST  Pedersen, Dean ARNP | | ICD-10 | I10 | 06/07/2023 | Current | |
| Aortic aneurysm, without rupture | | | | | | |
| 06/23/2023 22:00 EST  Dy, Maria Luisa (MAT) MD | | ICD-10 | I719 | 06/23/2023 | Current | |
| Abdominal aortic aneurysm | | | | | | |
| Chronic obstructive pulmonary disease [COPD] | | | | | | |
| 06/23/2023 22:00 EST  Dy, Maria Luisa (MAT) MD | | ICD-10 | J449 | 06/23/2023 | Current | |
| Asthma | | | | | | |
| 04/01/2025 13:49 EST  Rodriguez Irizarry, O. (MOUD) NP-C | | ICD-10 | J45909 | 04/01/2025 | Current | |
| Constipation, unspecified | | | | | | |
| 11/17/2023 14:10 EST  Durano, Giles (MAT) ARNP | | ICD-10 | K5900 | 11/17/2023 | Current | |
| Non-pressure chronic ulcer of other part of foot | | | | | | |
| 05/26/2023 21:39 EST  Pedersen, Dean ARNP | | ICD-10 | L97509 | 05/26/2023 | Current | |
| Diabetic ulcer plantar aspect of Left fourth metatarsal | | | | | | |
| Chest pain, unspecified | | | | | | |
| 07/02/2023 01:15 EST  Pedersen, Dean ARNP | | ICD-10 | R079 | 07/01/2023 | Current | |
| Unspecified abdominal pain | | | | | | |
| 07/02/2023 01:15 EST  Pedersen, Dean ARNP | | ICD-10 | R109 | 07/01/2023 | Current | |
| Unspecified skin changes | | | | | | |
| 09/24/2024 18:20 EST  Durano, Giles (MOUD) ARNP | | ICD-10 | R239 | 09/24/2024 | Current | |
| Pain, unspecified | | | | | | |
| 06/23/2023 23:38 EST  Dy, Maria Luisa (MAT) MD | | ICD-10 | R52 | 06/23/2023 | Current | |
| Right shoulder | | | | | | |
| Dislocation of shoulder joint | | | | | | |
| 10/23/2023 16:48 EST  Durano, Giles (MAT) ARNP | | ICD-10 | S43006 | 10/23/2023 | Current | |
| Injury of hip, unspecified | | | | | | |

Case 3:23-cr-05085-DGE  Document 1488  Exhibit C-2:  Filed 01/29/26  Page 13 of 100

Exhibit D-1:

### Affidavit of Clinton E. Ross Jr.
### Fed. Id. No: 05745-030:
### An Inmate at Butner F.C.I. II:

My name is Clinton E. Ross Jr., and I am submitting this Affidavit in support of Ronnie Griffin, Id. No. 50113-086. I swear under oath, that I have not been either given or promised anything or given any compensation for this Affidavit.

**Mr. Ron Griffin**, happens to be my cell-mate at the F.C.I. Butner II facility, in Butner, N.C. ... He has been my cell-mate for some __4__ months. In that time, I have personally noticed a significant decrease just in Mr. Griffin's ability to move. As he has severe Arthritis in both of his hands, and has had severe difficulty in holding onto things. This coming from someone whom has to pick-up all of the things that Mr. Griffin drops. (i.e. spoonfuls of coffee on the ground; Ramen soups that he trys to get into a plastic bowl; Powered drink mixes, that he cannot manage to get into his large plastic mug; his plastic dinnerware; as well as utensils, etc.) This also greatly upsets Mr. Griffin, which does not bode well for his High Blood Pressure. I have more or less become Mr. Griffin's "un-official" daily care-giver, as the Medical department here at FCI Butner refuses to 'hire and pay' their 'inmate companions' **unless** the inmate is extremely bad, (in their view). Mr. Griffin cannot button his shirt without assistance. He cannot tie his shoes without assistance, therefore has had to adjust to 'Velcro' strapped shoes. Mr. Griffin's memory has taken a big step backwards, in just the few months we have celled together. I have to consistently remind him of his (call-outs) (i.e. any daily appointments) he may have, as well as assisting him in taking his medications. Mr. Griffin has an immense problem with making his bed, (which from being in the military, is ingrained in him) but he just cannot do it. This in combination with bending over, as well as movement with his hands. Mr. Griffin **also,** cannot clean the cell. This was a bone of contention between the two of us, until I saw and came to the realization that Mr. Griffin is truly handicapped, regarding his Arthritis, as well as his ability to ambulate.

On September 13th, 2025; while laying in my top bunk, Mr. Griffin started to complain greatly that his chest was hurting extremely bad. I got down from my bunk, and quickly ascertained that he needed medical assistance. We were under a typical lockdown at the time. I pressed the distress button, but no correctional officer came.

(-1-)

Exhibit D-2:

## Affidavit of Clinton E. Ross Jr.
### Page Two of Three:

While I personally hate to do it, I beat and kicked on the cell door, in an attempt to get the officer's attention; meanwhile Mr. Griffin was visibly becoming more and more in pain. **Finally,** after approximately ten minutes, the officer, whom was **next door,** in another housing unit, came and asked what the problem was. I gave the officer a run down of what was transpiring, and requested medical assistance. (i.e. for her to call Medical and have them come with their mobile cart and get Mr. Griffin). The officer asked me, "Can he walk?" Mr. Griffin replied, he could stand up, but that was about it. The officer stated, to both me and to Mr. Griffin, "Unless he cannot stand up, we cannot call for Medical to come and get him."

I realized that this was not true, but instead of arguing about it, wanted to get Mr. Griffin to Medical as soon as possible. I placed him in the seat of the Walker that he uses, and pushed him some 150 yards to the Medical Department. The quickest route, is to go through the middle of the compound; but in trying to do so, we were told by two officers on said compound, that we would have to take the long way around. When I urgently and diplomatically explained that Mr. Griffin was experiencing a medical emergency; they stated, "they didn't care, go around the long way." I was, to say the least, flabbergasted at this response; again, without argument, I pushed Mr. Griffin around the long way. This resulted in Mr. Griffin having Blood Pressure readings in excess of 200, and being transferred via Granville County Ambulance, to Duke University Hospital. In the aftermath, I did so go to the Captain, (Royster), and explain what had transpired. She too was upset at what had transpired, and told me she would have "a discussion with said officers, as this was not the way they were to do things." **Yet,** here at FCI Butner II, I have found out, what is "suppose to be done" is far, far, different than what actually happens.

I can also attest to the fact that there is a **significant amount** of Black Mold, not only in our cell, but also in the shower area, and growing on the walls. The Institution knows this, but fails to do anything about it. Mr. Griffin coughs very raggedly and harshly throughout the night, and he has used his 'inhalers' more frequently now, then when he moved in with me. I requested Mr. Griffin to move in with me **because,** he does not use any drugs or alcohol. Something that runs rampant within the housing units at FCI Butner II. I have found Mr. Griffin to be an honest, forthright individual, whom will be a responsible law abiding 'citizen' if set free.

**Exhibit D-3:**

## Affidavit of Clinton E. Ross Jr.
### Page Three of Three:

**Mr. Griffin** also gets periods of confusion, as to what he needs to do, or where he needs to go, etc. The Medical Department here, considers any type of 'Memory problems' is due to that of 'Old Age.' Whereas they also consider any type of confusion issues are due to one's medications. Mr. Griffin is on several different types of medications.

I can attest that I, personally have been incarcerated within the Bureau of Prisons for some 27 years. (Since 1999); and after having been at **four** different USP's, and after having been at Pekin F.C.I. for some 16 years, I can honestly say, I have a **fair** assessment of the various institution's Medical Department(s) and their staff. How they work, what they are to do, and not do. After being here at Butner FCI II, for over a year, I can attest to my personal opinion that FCI Butner II, has the worst Medical bureaucracy, method of doing things, method of apprising one, of one's health issues; there lack of treatment, lack of follow-up; there lack of scheduling. With a full blown Hospital, right next door; numerous inmates that are here at Butner FCI II, should be over at the Hospital.

I can also attest that shortly after arriving here, (as I was placed on a DOJ 'Med-Jet' and along with one other inmate, was flown across the country from Pekin FCI straight to here, on a 'Medical Transfer.' ... Staff (both at Education, as well as Compound staff); told me that the Bureau of Prisons, sends you here to die. These statements came as quite a shock, but after having been here for over a year, I can see quite readily that it is actually true.

This is the actual (for the lack of a better term) "dumping grounds" for inmates that the B.O.P. just does not seek to spend too much money on. Especially, if you are along in years.

The state of the Institution is badly in need of repairs. Toliets in cells fill up with feces and 'defecated' water, from cells above you. This due to improper venting, (plumbing wise) when the prison units were built. These are harmful sanitation issues for Mr. Griffin and myself both.

I Clinton E. Ross do hereby attest and swear under the penalty of perjury, in accordance with § 1746, that the aforementioned statements are true and correct.

Dated: 12/10/2025

(-3-)

Clinton E. Ross Jr. # 05745-030

**Exhibit E-1:**

| Inmate Name: | GRIFFIN, RONNIE | | | Reg #: | 50113-086 |
|---|---|---|---|---|---|
| Date of Birth: | [REDACTED] | Sex: M   Race: WHITE | | Facility: | BTF |
| Encounter Date: | 09/13/2025 08:58 | Provider: Sanneh, Dauda RN | | Unit: | O01 |

| Date | Time | Rate Per Minute | Location | Rhythm | Provider |
|---|---|---|---|---|---|

**Respirations:**

| Date | Time | Rate Per Minute | Provider |
|---|---|---|---|
| 09/13/2025 | 09:28 BUX | 18 | Sanneh, Dauda RN |
| 09/13/2025 | 09:25 BUX | 18 | Sanneh, Dauda RN |

**Blood Pressure:**

| Date | Time | Value | Location | Position | Cuff Size | Provider |
|---|---|---|---|---|---|---|
| 09/13/2025 | 09:28 BUX | 175/137 | Left Arm | Lying | Adult-large | Sanneh, Dauda RN |
| 09/13/2025 | 09:25 BUX | 200/112 | Left Arm | Lying | Adult-large | Sanneh, Dauda RN |

**Blood Glucose:**

| Date | Time | Value (mg/dl) | Type | Regular Insulin | Provider |
|---|---|---|---|---|---|
| 09/13/2025 | 09:51 BUX | 98 | Non-Fasting | | Sanneh, Dauda RN |

**SaO2:**

| Date | Time | Value(%) | Air | Provider |
|---|---|---|---|---|
| 09/13/2025 | 09:28 BUX | 100 | Room Air | Sanneh, Dauda RN |
| 09/13/2025 | 09:25 BUX | 99 | Room Air | Sanneh, Dauda RN |

**ASSESSMENT:**

Pain - Chest

AIC is alert and oriented x3. He showed up to medical complaining of chest pain of 8/10 on his left side. He has elevated blood pressure and heart rate. His vital signs and EKG were obtained and recorded. Hospitalist on call was notified, and he ordered to take Lisinopril 10mg tab, Metoprolol Tartrate 12.5mg tab, and Nitroglycerin 0.4mg sublingual. He is to be transferred to Duk e regional Hospital.

**PLAN:**

**Disposition:**

To be Evaluated by Provider

**Patient Education Topics:**

| Date Initiated | Format | Handout/Topic | Provider | Outcome |
|---|---|---|---|---|
| 09/13/2025 | Counseling | Access to Care | Sanneh, Dauda | Verbalizes Understanding |

**Copay Required:** No          **Cosign Required:** No

**Telephone/Verbal Order:** No

Completed by Sanneh, Dauda RN on 09/13/2025 09:52

Requested to be reviewed by Soheili, Kambiz (MOUD-M) MD.

Review documentation will be displayed on the following page.

Male      Unknown

Room:TR46
Loc:201

| | | | |
|---|---|---|---|
| Vent. rate | 97 | BPM | Atrial fibrillation |
| PR interval | * | ms | Abnormal ECG |
| QRS duration | 94 | ms | When compared with ECG of 13-Sep-2025 13:46, |
| QT/QTcB | 318/403 | ms | No significant change was found |
| P-R-T axes | * 62 | 48 | I reviewed and concur with this report. Electronically signed by:MATHEWS, MD, ROBIN (5414) on 9/13/2025 4:13:51 PM |

Technician: nm
Test ind:

Referred by:   KAMBIZ SOHEILI          Confirmed By:   ROBIN MATHEWS, MD

Case 3:23-cr-05085-DGE    Document 1488    Filed 01/29/26    Page 18 of 100

Exhibit E-2:

25mm/s    10mm/mV    150Hz    10.2.6    12SL 243    CID: 1        EID: 5414 EDT: 16:13 13-Sep-2025 ORDER: 887208741 ACCOUNT: 399927995

GRIFFIN, RONNIE

ID:D3885427     13-Sep-2025  13:46:57                    Duke Health-DRHER  ROUTINE RECORD

Male        Unknown

Room:TR46
Loc:201

| | | | |
|---|---|---|---|
| Vent. rate | 102 | BPM | Atrial fibrillation with rapid ventricular response with premature ventricular or aberrantly conducted complexes |
| PR interval | * | ms | Abnormal ECG |
| QRS duration | 90 | ms | No previous ECGs available |
| QT/QTcB | 318/414 | ms | I reviewed and concur with this report. Electronically signed by:MATHEWS, MD, ROBIN (5414) on 9/13/2025 |
| P-R-T axes | * 59 | 46 | 2:35:39 PM |

Technician: nm
Test ind:

Referred by:  KAMBIZ SOHEILI              Confirmed By:  ROBIN MATHEWS, MD

25mm/s    10mm/mV    150Hz    10.2.6    12SL 243    CID: 1

EID: 5414 EDT: 14:35 13-Sep-2025 ORDER: 887208738 ACCOUNT: 399927995

Page 1 of 1

Exhibit E-3:

Exhibit F-1:

# Bureau of Prisons
# Health Services
# Clinical Encounter

| | | |
|---|---|---|
| Inmate Name:  GRIFFIN, RONNIE | | Reg #:  50113-086 |
| Date of Birth: | Sex:    M    Race:  WHITE | Facility:  BTF |
| Encounter Date:  04/21/2025 13:54 | Provider:  Rogers, Richard (MOUD) | Unit:    O01 |

**Reviewed Health Status:**    Yes

Chronic Care - Chronic Care Clinic encounter performed at Health Services.

**SUBJECTIVE:**

COMPLAINT  1        Provider:  Rogers, Richard (MOUD) MD

Chief Complaint:   Chronic Care Clinic

Subjective:        AIC is a 66 yo male with PMHx significant for T2DM with diabetic neuropathy, chronic HCV, PAF, COPD/asthma, HTN, HLD, MDD, AAA and hypothyroidism presenting to CCC

AIC denies cp/sob/f/c/n/v/d

AIC is able to perform all ADLs

AIC reports compliance with all medications

FMHx:
Father:  deceased age 45, colon cancer      Mother:  deceased age 70, DM      Siblings: 3

SHx:
Tobacco:  1 PPD x 45 years      Drugs:  methamphetamine

Colon cancer screening:
Refusal for GI consult for colonoscopy signed 8/18/24
Refusal for colorectal cancer screening signed 10/15/24

Allergies: An allergy review was completed with patient for the presence or absence of allergies, sensitivities, and other reactions to drugs, materials, food and environmental factors,
NKDA

Pain:        No

---

**Allergies:**

| Allergy | Reaction | Comments |
|---|---|---|
| No Known Allergies | | |

Allergies list reviewed/updated for the presence or absence of allergies, sensitivities, and other reactions to drugs, materials, food and environmental factors with the patient on 04/21/2025 13:54 by Rogers, Richard (MOUD) MD

**Seen for clinic(s):** Cardiac, Diabetes, Endocrine/Lipid, Hypertension, Infectious Disease, Orthopedic/Rheumatology, Pulmonary/Respiratory

**OBJECTIVE:**

**Temperature:**

| Date | Time | Fahrenheit | Celsius | Location | Provider |
|---|---|---|---|---|---|
| 04/21/2025 | 14:29 BUX | 97.9 | 36.6 | | Rogers, Richard (MOUD) MD |

**Pulse:**

| Date | Time | Rate Per Minute | Location | Rhythm | Provider |
|---|---|---|---|---|---|
| 04/21/2025 | 14:29 BUX | 90 | | | Rogers, Richard (MOUD) MD |

Exhibit P2:

| Inmate Name: | GRIFFIN, RONNIE | | | | | | Reg #: | 50113-086 |
|---|---|---|---|---|---|---|---|---|
| Date of Birth: | | | | Sex: | M | Race: WHITE | Facility: | BTF |
| Encounter Date: | 04/21/2025 13:54 | | | Provider: | Rogers, Richard (MOUD) | | Unit: | O01 |

| Date | Time | Rate Per Minute | Location | Rhythm | Provider |
|---|---|---|---|---|---|

**Respirations:**

| Date | Time | | Rate Per Minute | Provider |
|---|---|---|---|---|
| 04/21/2025 | 14:29 BUX | | 16 | Rogers, Richard (MOUD) MD |

**Blood Pressure:**

| Date | Time | Value | Location | Position | Cuff Size | Provider |
|---|---|---|---|---|---|---|
| 04/21/2025 | 14:29 BUX | 144/88 | | | | Rogers, Richard (MOUD) MD |

**SaO2:**

| Date | Time | Value(%) | Air | Provider |
|---|---|---|---|---|
| 04/21/2025 | 14:29 BUX | 97 | | Rogers, Richard (MOUD) MD |

**Height:**

| Date | Time | Inches | Cm | Provider |
|---|---|---|---|---|
| 04/21/2025 | 14:29 BUX | 74.0 | 188.0 | Rogers, Richard (MOUD) MD |

**Weight:**

| Date | Time | Lbs | Kg | Waist Circum. | Provider |
|---|---|---|---|---|---|
| 04/21/2025 | 14:29 BUX | 234.8 | 106.5 | | Rogers, Richard (MOUD) MD |

## ROS Comments

General: No fever, chills, fatigue, unexplained wt loss
Hair: No hair loss
Nails: No onychomycosis
Skin: No rashes, suspicious lesions, bruises
Head: No headaches
Ears: No hearing loss, no tinnitus, no earache, no drainage
Eyes: Wears glasses, no vision loss
Nose: No epistaxis
Mouth: Missing teeth, no sores, no dry mouth
Neck: No pain, no stiffness
Throat: No cough, no sore throat, no difficulty swallowing
Heart: No chest pain, no palpitations
Lungs: No SOB, no pleural pain
GI: No nausea, vomiting, diarrhea, constipation, abdominal pain, heartburn
GU: Nocturia 5-6 times per night, no dysuria, difficulty with urination
MSK: No myalgia, weakness, reduced AROM
Ext: No edema
Neuro: Numbness of feet b/l
Lymphatics: No LAD
Psych: No SI/HI

## Exam Comments

General: alert and oriented x 3, cooperative, NAD
HEENT: N/A, MMM, poor dentition, TMs wnl
Lymphatic: no LAD
Neck: supple
Heart: RRR, NL S1/S2, no M/R/G
Lungs: CTAB, unlabored breathing, no wheezes, rhonchi or crackles
Abdomen: normoactive BS, soft/NT/ND, no palpable masses/hernias
Rectal: deferred
MSK: weakness RUE, uses wheelchair to aid in ambulation
Feet: diabetic food exam: amputation of right great toe, monofilament test positive for loss of sensation in all zones
except dorsum of left foot and plantar surface of right great toe
Skin: stasis dermatitis of LEs b/l, bruises or suspicious lesions, warm/dry to touch
Ext: wears knee-high compression stockings

| Inmate Name: | GRIFFIN, RONNIE | | | | | Reg #: | 50113-086 |
|---|---|---|---|---|---|---|---|
| Date of Birth: | | Sex: | M | Race: | WHITE | Facility: | BTF |
| Encounter Date: | 04/21/2025 13:54 | Provider: | Rogers, Richard (MOUD) | | | Unit: | O01 |

Psych: appropriate mood/affect
Neuro: CN 2-12 grossly intact

## ASSESSMENT:

Acquired absence of great toe, Z89419 - Current - *Amputation right great toe*

Aortic aneurysm, without rupture, I719 - Current

Asthma, J45909 - Current

Cellulitis, unspecified, L0390 - Resolved

Chronic obstructive pulmonary disease [COPD], J449 - Current

Chronic viral hepatitis C, B182 - Current - *Will need to treat*

Essential (primary) hypertension, I10 - Current - *BP appropriate on current regimen, continue with no changes*

Hypothyroidism, E039 - Current - *Continue TRT*

Major depressive disorder, single episode, F329 - Current

Type 2 diabetes mellitus with diabetic neuropathy, E1140 - Current - *HbA1c 5.4% (12/19/24)*

## PLAN:

### New Laboratory Requests:

| Details | Frequency | Due Date | Priority |
|---|---|---|---|
| Lab Tests-H-Hemoglobin A1C | One Time | 04/28/2025 00:00 | Routine |

### New Consultation Requests:

| Consultation/Procedure | Target Date | Scheduled Target Date | Priority | Translator | Language |
|---|---|---|---|---|---|
| Cardiology | 10/07/2025 | 10/07/2025 | Routine | No | |

Subtype:
> Inhouse Clinic

Reason for Request:
> AIC is a 66 yo male with PMHx significant for T2DM with diabetic neuropathy, chronic HCV, PAF, COPD/asthma, HTN, HLD, MDD, AAA and hypothyroidism previously followed by cardiology and h/o Zio Patch Monitor placement in Jan 2025 needs cardiology f/u.

| Consultation/Procedure | Target Date | Scheduled Target Date | Priority | Translator | Language |
|---|---|---|---|---|---|
| Urology | 07/07/2025 | 07/07/2025 | Routine | No | |

Subtype:
> Inhouse Clinic

Reason for Request:
> AIC is a 66 yo male with PMHx significant for T2DM with diabetic neuropathy, chronic HCV, PAF, COPD/asthma, HTN, HLD, MDD, AAA and hypothyroidism with LUTS including nocturia 5-6 times nightly

### Discontinued Consultation Requests:

| Consultation/Procedure | Target Date | Scheduled Target Date | Priority | Translator | Language |
|---|---|---|---|---|---|
| Gastroenterology | 11/05/2024 | 11/05/2024 | Routine | No | |

Subtype:

Reason for Request:
> Patient requires a repeat colonoscopy with a lengthy bowel prep (see the last GI note) as the patient was poorly prepped for the previous colonoscopy.

| Consultation/Procedure | Target Date | Scheduled Target Date | Priority | Translator | Language |
|---|---|---|---|---|---|
| Podiatry | 12/09/2024 | 12/09/2024 | Routine | No | |

Subtype:

Reason for Request:
> Follow-up of diabetic ulcer care for debridement and reevaluation

Exhibit F-4:

| Inmate Name: GRIFFIN, RONNIE | | | Reg #: 50113-086 |
| --- | --- | --- | --- |
| Date of Birth: | Sex: M Race: WHITE | | Facility: BTF |
| Encounter Date: 04/21/2025 13:54 | Provider: Rogers, Richard (MOUD) | | Unit: O01 |

Provisional Diagnosis:

Diabetic foot ulcer

| Podiatry | 03/03/2025 | 03/03/2025 | Routine | No |
| --- | --- | --- | --- | --- |

Subtype:

Reason for Request:

Follow-up with podiatrist who saw him January 21, 2025; podiatrist desires to see him again in 4-6 weeks for continuing care diabetic foot ulcer.

Provisional Diagnosis:

Diabetic foot ulcer.

| Cardiology | 02/25/2025 | 02/25/2025 | Urgent | No |
| --- | --- | --- | --- | --- |

Subtype:

Reason for Request:

66 yo male with A-Fib and had a Holter monitor place a few weeks ago.  He had an episode of chest pain today and relieved with x 2 NTG. Pls Eval. and follow-up

Schedule:

| Activity | Date Scheduled | Scheduled Provider |
| --- | --- | --- |
| Consultation | 04/23/2025 00:00 | Phys Therapist 01 |

AIC is a 66 yo male with PMHx significant for T2DM with diabetic neuropathy, chronic HCV, PAF, COPD/asthma, HTN, HLD, MDD, AAA and hypothyroidism
-has significant loss of sensation in both feet, currently using wheelchair to aid in ambulation, interested in being evaluated for appropriateness of walker rather than wheelchair

| Chronic Care Visit | 02/23/2026 00:00 | Physician 01 |
| --- | --- | --- |

CCC done 04/21/2025

Disposition:

Follow-up at Sick Call as Needed
Follow-up at Chronic Care Clinic as Needed

Patient Education Topics:

| Date Initiated | Format | Handout/Topic | Provider | Outcome |
| --- | --- | --- | --- | --- |
| 04/21/2025 | Counseling | Access to Care | Rogers, Richard | Verbalizes Understanding |

Copay Required: No          Cosign Required: No

Telephone/Verbal Order:  No

Completed by Rogers, Richard (MOUD) MD on 04/23/2025 10:40

Exhibit F-5:

# Bureau of Prisons
## Health Services
## Clinical Encounter

| | |
|---|---|
| Inmate Name:  GRIFFIN, RONNIE | Reg #:  50113-086 |
| Date of Birth: ▬▬▬▬ | Sex:  M  Race:  WHITE  Facility:  BTF |
| Encounter Date:  05/16/2025 14:00 | Provider:  Nobles, T. DPT/OCS, SER  Unit:  O01 |

**Reviewed Health Status:**    Yes

Physical Therapy - Evaluation encounter performed at Rehabilitation Services.

**SUBJECTIVE:**

COMPLAINT  1        Provider:  Nobles, T. DPT/OCS, SER

Chief Complaint:    Other Problem

Subjective:     Consultation: AIC is a 66 yo male with PMHx significant for T2DM with diabetic neuropathy, chronic HCV, PAF, COPD/asthma, HTN, HLD, MDD, AAA and hypothyroidism
-has significant loss of sensation in both feet, currently using wheelchair to aid in ambulation, interested in being evaluated for appropriateness of walker rather than wheelchair

Patient reports having had a diabetic ulcer to the bottom of his foot for ~2.5 years and has since been closed for the last 5 months. States that he has been in the wheelchair for a long time and wants to get up and do more walking. Reports that he has been walking the compound for a while now and he has been doing well (behind the wheelchair). Patient requesting that his callus be trimmed on the bottom of his foot.

Pain:       No

**Allergies:**

| Allergy | Reaction | Comments |
|---|---|---|
| No Known Allergies | | |

Allergies list reviewed/updated for the presence or absence of allergies, sensitivities, and other reactions to drugs, materials, food and environmental factors on 05/16/2025 14:00 by Nobles, T. DPT/OCS, SER Therapist

**OBJECTIVE:**

**Exam Comments**

DFS completed.  See document manager for details.

Mild deformity with R great toe amputation. Presumably h/o osteo
Chronic callus to L 4th metatarsal from previous fracture.  No bone infections on LEFT foot reported.

Gait: steady and no LOB or SOB.  Mild decrease in step length and and stance on L foot.

Issued walker for temporary use until feels comfortable to have a cane.  Issued for 6 months.  Patient educated to send copout regarding exchange.

Issued new pair insoles (Size12W) for medical footwear (size 13W)from previous institution.  Will send copout if they do not fit as he did not have shoes in clinic.  Patient wearing personal sneakers and educated that these may not do best job of protecting foot.

Issued new pair compression L full calf 20-30

**ASSESSMENT:**

Prevention/Risk Reduc for Integumentary Disorders

CAT 3 diabetic with history of sensation loss, ulcers, amputation and deformity.  Routine f/u's completed every 1-3 months by rehab.

Exhibit F-6

# Bureau of Prisons
# Health Services
# Clinical Encounter

| | | |
|---|---|---|
| Inmate Name: GRIFFIN, RONNIE | | Reg #: 50113-086 |
| Date of Birth: ▮▮▮▮ | Sex: M Race: WHITE | Facility: BTF |
| Encounter Date: 05/13/2025 13:12 | Provider: Rodriguez Irizarry, O. | Unit: O01 |

**Reviewed Health Status:** Yes

Advanced Practice Provider - Sick Call Note encounter performed at Health Services.

## SUBJECTIVE:

COMPLAINT 1        Provider:  Rodriguez Irizarry, O. (MOUD) NP-C

Chief Complaint:   Skin Problem

Subjective:   66 yo male with PMHx significant for T2DM with diabetic neuropathy, chronic HCV, PAD, COPD/asthma, HTN, HLD, MDD, AAA and hypothyroidism presents with c/o recurrence of blister to LLE that he noticed today. Reports having another blister that is healing on LLE with onset of 2 weeks. Denies f/c, fatigue, CP, palpitations, dyspnea, abd pain, n/v. Denies difficulties with ambulation. Reports having wounds to LLE in the past d/t PAD and hx of cellulitis to LLE.

Pain:        Yes

Pain Assessment

| | |
|---|---|
| Date: | 05/13/2025 13:18 |
| Location: | Leg-Lower Left Front |
| Quality of Pain: | Pins and Needles |
| Pain Scale: | 5 |
| Intervention: | per plan of care |
| Trauma Date/Year: | |
| Injury: | Right shoulder dislocations |
| Mechanism: | Multiple episodes of Fall |
| Onset: | 5+ Years |
| Duration: | 5+ Years |
| Exacerbating Factors: | prolonged sitting |
| Relieving Factors: | changing positions ELavil |
| Reason Not Done: | |
| Comments: | |

## Allergies:

| Allergy | Reaction | Comments |
|---|---|---|
| No Known Allergies | | |

Allergies list reviewed/updated for the presence or absence of allergies, sensitivities, and other reactions to drugs, materials, food and environmental factors with the patient on 05/13/2025 13:12 by Rodriguez Irizarry, O. (MOUD) NP-C

## OBJECTIVE:
## Temperature:

| Date | Time | | Fahrenheit | Celsius | Location | Provider |
|---|---|---|---|---|---|---|
| 05/13/2025 | 13:00 | BUX | 97.7 | 36.5 | | Rodriguez Irizarry, O. (MOUD) NP-C |

## Pulse:

Exhibit F-7:

| Inmate Name: | GRIFFIN, RONNIE | | | | | | Reg #: | 50113-086 |
|---|---|---|---|---|---|---|---|---|
| Date of Birth: | | | Sex: | M | Race: WHITE | | Facility: | BTF |
| Encounter Date: | 05/16/2025 14:00 | | Provider: | Nobles, T. DPT/OCS, SER | | | Unit: | O01 |

**PLAN:**

Schedule:

| **Activity** | **Date Scheduled** | **Scheduled Provider** |
|---|---|---|
| Diabetic Foot Screen | 06/04/2025 12:30 | Phys Therapist 07 |

    CAT 3 diabetic with sensory loss, amputation, ulceration history and deformity.

    May need brace clinic consult for custom orthotics if skin under L 4th met head is continuing to bruise

**Disposition:**

    Follow-up at Sick Call as Needed

**Patient Education Topics:**

| Date Initiated | Format | Handout/Topic | Provider | Outcome |
|---|---|---|---|---|
| 05/16/2025 | Counseling | Access to Care | Nobles, T. | Verbalizes Understanding |
| 05/16/2025 | Counseling | Diabetic Foot Care | Nobles, T. | Verbalizes Understanding |

**Copay Required:** No      **Cosign Required:** No

**Telephone/Verbal Order:** No

Completed by Nobles, T. DPT/OCS, SER Therapist on 05/16/2025 14:35

Griffin, Ronnie (MR # D3885427) ▮▮▮▮▮ Encounter Date: 08/07/2025    *50113- 086 BTF*

| CSN | MRN |
|---|---|
| **390953645** | **D3885427** |

# Griffin, Ronnie

MRN: D3885427

**Initial consult**
8/7/2025
Vascular Access

Provider: Minc, Samantha Danielle, MD (Vascular Surgery)
Primary diagnosis: PAD (peripheral artery disease) ()
Reason for Visit: New Patient 🅑; Referred by Rodriguez-Irizarry, Odalys, NP

## 🗐 Progress Notes

Minc, Samantha Danielle, MD (Physician) • Vascular Surgery

**Duke** Surgery

Division of Vascular & Endovascular Surgery

## Clinic Note

**Referring Practitoner:** Rodriguez-Irizarry, Odalys, NP
OLD HWY 75
BUTNER, NC 27509
**Reason for Visit:**
**Chief Complaint**
Patient presents with
• New Patient
  PAD

### HPI
Ronnie Griffin is a 66 y.o. male who presents for evaluation for leg wounds. He has a history of DM2, HTN, AAA (possibly scanned last year), afib on anticoagulation, COPD, HCV, hypothyroidism, who presents for evaluation of non healing wound to lower leg. The patient has a history of edema related leg ulcers of the BLE with blistering and eventually healing. He states he uses compression but has a hard time putting them on and off. He denies venous procedures. He does have history of a DVT on the left side after hip surgery. He has had numerous foot ulcers related to his diabetic neuropathy and currently has a plantar wound on the left foot and toe tip ulcers bilaterally. He has been treated by a podiatrist in the past, but not here.

Patient reports that he quit smoking about 40 years ago. His smoking use included cigarettes. He started smoking about 2 years ago. He has never used smokeless tobacco.

---

## 🗐 Orders Placed

US abdominal aorta
Ambulatory Referral to Vascular Surgery Pending Review
Compression stockings

## 🍼 Medication Changes

None

## ⚕ Visit Diagnoses

◆ PAD (peripheral artery disease) () I73.9

Varicose veins of both lower extremities with complications I83.893

Abdominal aortic aneurysm (AAA) without rupture, unspecified part () I71.40

## ⏏ Discharge

Discharge Orders
US abdominal aorta

---

Exhibit F-9:

Griffin, Ronnie (MR # D3885427) DOB: ███████ Encounter Date: 08/07/2025

## Medical History

### Social History

Tobacco Use
Smoking Status     Former
• Types:            Cigarettes
• Start date:       2023
• Quit date:        8/7/1985
• Years since       40.0
  quitting:
Smokeless           Never
Tobacco

### Past Medical History:

Diagnosis                                          Date
• Arthritis
• Asthma, unspecified asthma severity, unspecified
  whether complicated, unspecified whether persistent
  (HHS-HCC)
• COPD (chronic obstructive pulmonary disease)
  (CMS/HHS-HCC)
• Diabetes mellitus without complication (CMS/HHS-
  HCC)
• History of stroke
• Substance abuse (CMS/HHS-HCC)
• Thyroid disease

Current Outpatient Medications:
• albuterol MDI, PROVENTIL, VENTOLIN, PROAIR, HFA 90
mcg/actuation inhaler, Inhale 2 inhalations into the lungs, Disp: , Rfl:
• apixaban (ELIQUIS) 5 mg tablet, Take 5 mg by mouth every 12
(twelve) hours, Disp: , Rfl:
• atorvastatin (LIPITOR) 40 MG tablet, Take 40 mg by mouth once
daily, Disp: , Rfl:
• glucose chew tablet 4 gram chewable tablet, Take 4 tablets by
mouth as needed for Low blood sugar, Disp: , Rfl:
• insulin NPH (HUMULIN N PEN) pen injector (concentration 100
units/mL), Inject subcutaneously 2 (two) times daily before meals,
Disp: , Rfl:
• levothyroxine (SYNTHROID) 50 MCG tablet, Take 50 mcg by
mouth once daily Take on an empty stomach with a glass of water at
least 30-60 minutes before breakfast., Disp: , Rfl:
• lidocaine (LIDODERM) 5 % patch, Place 1 patch onto the skin
daily Apply patch to the most painful area for up to 12 hours in a 24
hour period., Disp: , Rfl:
• lisinopriL (ZESTRIL) 10 MG tablet, Take 10 mg by mouth once
daily, Disp: , Rfl:
• mometasone (ASMANEX TWISTHALER) 220 mcg/ actuation
(120) inhaler, Inhale 1 Puff into the lungs, Disp: , Rfl:
• nitroGLYcerin (NITROSTAT) 0.4 MG SL tablet, Place 0.4 mg under
the tongue every 5 (five) minutes as needed for Chest pain May take
up to 3 doses., Disp: , Rfl:

Griffin, Ronnie (MR # D3885427) DOB: ███████ Encounter Date: 08/07/2025

Not on File

History reviewed. No pertinent surgical history.

## Social History

Socioeconomic History
 • Marital status:      Single
Tobacco Use
 • Smoking status:      Former
      Types:        Cigarettes
      Start date:    2023
      Quit date:     8/7/1985
      Years since    40.0
      quitting:
 • Smokeless       Never
   tobacco:

## Social Drivers of Health

Housing Stability: Unknown (8/7/2025)
   Housing Stability Vital Sign
    • Homeless in the Last Year: No


History reviewed. No pertinent family history.

## ROS


Complete ROS completed by patient on intake form which will be scanned into the chart.

## Objective Data

### Physical Exam
**Vitals:**

|        | 08/07/25 1023 |
|--------|---------------|
| BP:    | (!) 172/112   |
| Pulse: | 98            |
| SpO2:  | 100%          |
| PainSc:| 0-No pain     |


General: AA&O X3 Well developed and well nourished in no acute distress
HENT: Head is normocephalic, atraumatic
Eyes: Conjunctiva clear., Pupils equal and round. Sclera non-icteric. EOMI
Neck: Normal ROM, Supple, symmetrical
Lungs: Effort normal, clear to auscultation bilaterally.
Cardiovascular: irreg irreg, no murmur, click, rub or gallop
Abdomen: Soft, non distended non-tender to palpation, no rebound or guarding present. No pulsatile masses.
Extremities: Bilateral chronic edema and diabetic foot deformities (see images below)
Skin: scattered wounds of the BLE

Exhibit F-11:

# Bureau of Prisons
# Health Services
# Clinical Encounter - Administrative Note

| | | | | |
|---|---|---|---|---|
| Inmate Name: | GRIFFIN RONNIE | | Reg #: | 50113-086 |
| Date of Birth: | | Sex:  M    Race: WHITE | Facility: | BUH |
| Note Date: | 08/12/2025 13:35 | Provider:  Bowman, C. PT | Unit: | S02 |

**Reviewed Health Status:**  Yes

Admin Note - Consultation encounter performed at Rehabilitation Services.

**Administrative Notes:**

  ADMINISTRATIVE NOTE   1          Provider:  Bowman, C. PT

   Pt seen in brace clinic at FMC on 3rd floor in rehab services modality room for on-site visit with certified prosthetist/orthotist (CPO) (date of service: 08/12/2025) per referral from primary PT in regard to need for custom foot orthotics, diabetic footwear, and footwear modifications due history of chronic wounds, callus to L V met, and R great toe amputation. Pt has diminished sensation in feet bilaterally with limited ankle DF and great toe extension. Pt presents with compression stockings in tattered condition this date with hem of bilaterally stockings catching on toes. CPO fitted for diabetic footwear this date and molded for custom diabetic insoles. Brace clinic PT reissued pt 20-30 mmHg size large compression stockings this date x1 pair, pt informed he will be issued 2nd pair upon return to parent institution and tattered remaining pair is returned to rehab services, verbalized understanding. Primary PT will issue items upon arrival. No further follow-up brace clinic needs are indicated at this time.

**Copay Required:** No          **Cosign Required:** No

**Telephone/Verbal Order:**  No

Completed by Bowman, C. PT on 08/12/2025 13:37

Requested to be reviewed by  Nobles, T. DPT/OCS, SER Therapist.

Review documentation will be displayed on the following page.

# Bureau of Prisons
## Health Services
## Clinical Encounter - Administrative Note

| | | | | | |
|---|---|---|---|---|---|
| Inmate Name: | GRIFFIN, RONNIE | | | Reg #: | 50113-086 |
| Date of Birth: | ▮▮▮▮▮ | Sex: | M    Race: WHITE | Facility: | BTF |
| Note Date: | 08/20/2025 15:31 | Provider: | Rodriguez Irizarry, O. | Unit: | O01 |

**Reviewed Health Status:**   No

Admin Note - Report Review encounter performed at Health Services.

**Administrative Notes:**

ADMINISTRATIVE NOTE   1          Provider:   Rodriguez Irizarry, O. (MOUD) NP-C

Inmate seen by vascular surgery at Duke on

A/P
1-diabetic footwear- seen PT note from 8/13/25. He was seen by brace clinic and already pending delivery of footwear.

2- referred to Dan Geerson and Vascular Surgery leg swelling clinic for evaluation for venous insufficiency and lymphedema.

3- compression stockings 20-30 mmHg- inmate already has been given this compression garments 8/12/25.

4) AAA- needs aortic u/s for surveillance ASAP.

**New Radiology Request Orders:**

| Details | Frequency | End Date | Due Date | Priority |
|---|---|---|---|---|
| Ultrasound-Abdomen-General | One Time | | 09/05/2025 | Routine |

Specific reason(s) for request (Complaints and findings):

66 y/o male with hx of AAA needs aortic u/s for surveillance.

**New Consultation Requests:**

| Consultation/Procedure | Target Date | Scheduled Target Date | Priority | Translator | Language |
|---|---|---|---|---|---|
| Vascular Surgery | 10/31/2025 | 10/31/2025 | Routine | No | |

Subtype:

Offsite

Reason for Request:

66 y/o male with BLW chronic edema and wounds and diabetic neuropathy with foot changes and chronic ulcers need evaluation with Dan Geerson and vascular surgery leg swelling clinic venous insufficiency and lymphedema.

**Copay Required:** No          **Cosign Required:** No

**Telephone/Verbal Order:**   No

Completed by Rodriguez Irizarry, O. (MOUD) NP-C on 08/20/2025 15:38

# Bureau of Prisons
# Health Services
# Clinical Encounter

| | | |
|---|---|---|
| Inmate Name:  GRIFFIN, RONNIE | | Reg #:  50113-086 |
| Date of Birth: | Sex:    M    Race:  WHITE | Facility:  BTF |
| Encounter Date:  09/05/2025 10:14 | Provider:  Williams, Tiffany (MOUD- | Unit:    O01 |

**Reviewed Health Status:**    Yes

Advanced Practice Provider - Evaluation encounter performed at Health Services.

**SUBJECTIVE:**

COMPLAINT  1          Provider:  Williams, Tiffany (MOUD-M) PA-C

Chief Complaint:   Skin Problem

Subjective:      The housing officer called medical to state the inmate has an infected toe.

He did not show up for sick call because he over slept

he was told to come to medical to see if the condition of his foot could wait until next sick call

He presents to medical with a rolling walker

he has chronic vascular problems involving his foot and is a type 2 diabetic

He reports the problem began a few days ago.  Due to neuropathy, he has decreased sensation in his foot, but the first digit of the left foot is painful.

He does not endorse night sweats fever or chills

**Pain:**        Yes

**Pain Assessment**

| | |
|---|---|
| Date: | 09/05/2025 10:18 |
| Location: | Toe(s)-Left |
| Quality of Pain: | Aching |
| Pain Scale: | 7 |
| Intervention: | supportive care |
| Trauma Date/Year: | |
| Injury: | Right shoulder dislocations |
| Mechanism: | Multiple episodes of Fall |
| Onset: | 3-5 Days |
| Duration: | <30 Minutes |
| Exacerbating Factors: | pressure |
| Relieving Factors: | nothing mentioned |
| Reason Not Done: | |
| Comments: | |

**Allergies:**

| Allergy | Reaction | Comments |
|---|---|---|
| No Known Allergies | | |

Allergies list reviewed/updated for the presence or absence of allergies, sensitivities, and other reactions to drugs, materials, food and environmental factors with the patient on 09/05/2025 10:14 by Williams, Tiffany (MOUD-M) PA-C

Exhibit F-14:

# Bureau of Prisons
## Health Services
## Clinical Encounter - Administrative Note

| | | | | |
|---|---|---|---|---|
| Inmate Name: | GRIFFIN, RONNIE | | Reg #: | 50113-086 |
| Date of Birth: | ▮▮▮▮▮▮ | Sex: M    Race:WHITE | Facility: | BTF |
| Note Date: | 09/09/2025 15:35 | Provider: Bowman, C. PT | Unit: | O01 |

**Reviewed Health Status:** Yes

Admin Note - Consultation encounter performed at Receiving & Discharge.

**Administrative Notes:**

ADMINISTRATIVE NOTE   1          Provider:  Bowman, C. PT

Pt not formally seen in brace clinic this date with certified prosthetist and orthotist (CPO) (09/09/2025) however brace clinic PT received consultation form from primary therapist regarding pt need for custom diabetic insoles, medical shoes and medical shoe modification with rocker bottom. Pt has history of open wounds, L foot chronic callus at 4th met head, and R great toe amputation. Pt is CAT 3 diabetic risk category. Pt seen in previous brace clinic for molding of foot orthotics and measuring of shoe size. Pt was measured as size 13W shoe with custom orthotic impressions taken. Pt not seen in clinic this date however CPO did deliver shoes and insoles; however, L insole with additional modification needed. CPO to make modification and return prior to next clinic. Primary PT to issue upon arrival. See document manager for uploaded consultation form from this encounter. See device/equipment list and MDS for formal additional of item to pt property upon issuance.

**Copay Required:** No          **Cosign Required:** No

**Telephone/Verbal Order:** No

Completed by Bowman, C. PT on 09/10/2025 15:37

Requested to be reviewed by Nobles, T. DPT/OCS, SER Therapist.

Review documentation will be displayed on the following page.

Exhibit F-15:

# Bureau of Prisons
## Health Services
## Clinical Encounter

| | | |
|---|---|---|
| Inmate Name: GRIFFIN, RONNIE | | Reg #: 50113-086 |
| Date of Birth: | Sex: M Race: WHITE | Facility: BTF |
| Encounter Date: 09/13/2025 08:58 | Provider: Sanneh, Dauda RN | Unit: O01 |

**Reviewed Health Status:** Yes

Nursing - Evaluation encounter performed at Housing Unit.

**SUBJECTIVE:**

COMPLAINT 1        Provider: Sanneh, Dauda RN

Chief Complaint: Chest Pain

Subjective: "I have been having chest pain for the past hour."

Pain:        Yes

Pain Assessment

| | |
|---|---|
| Date: | 09/13/2025 09:23 |
| Location: | Chest-Left |
| Quality of Pain: | Sharp |
| Pain Scale: | 8 |
| Intervention: | Nitroglycerin |
| Trauma Date/Year: | |
| Injury: | Right shoulder dislocations |
| Mechanism: | Multiple episodes of Fall |
| Onset: | <30 Minutes |
| Duration: | <30 Minutes |
| Exacerbating Factors: | "Nothing." |
| Relieving Factors: | "Nothing." |
| Reason Not Done: | |
| Comments: | |

**Allergies:**

| Allergy | Reaction | Comments |
|---|---|---|
| No Known Allergies | | |

Allergies list reviewed/updated for the presence or absence of allergies, sensitivities, and other reactions to drugs, materials, food and environmental factors with the patient on 09/13/2025 08:58 by Sanneh, Dauda RN

**OBJECTIVE:**

Temperature:

| Date | Time | Fahrenheit | Celsius | Location | Provider |
|---|---|---|---|---|---|
| 09/13/2025 | 09:28 BUX | 97.5 | 36.4 | Forehead | Sanneh, Dauda RN |
| 09/13/2025 | 09:25 BUX | 97.3 | 36.3 | Forehead | Sanneh, Dauda RN |

Pulse:

| Date | Time | Rate Per Minute | Location | Rhythm | Provider |
|---|---|---|---|---|---|
| 09/13/2025 | 09:28 BUX | 106 | Via Machine | Regular | Sanneh, Dauda RN |
| 09/13/2025 | 09:25 BUX | 108 | Via Machine | Regular | Sanneh, Dauda RN |

Exhibit E-16:

# Bureau of Prisons
# Health Services
## Clinical Encounter - Administrative Note

| | | | | |
|---|---|---|---|---|
| Inmate Name: | GRIFFIN, RONNIE | | Reg #: | 50113-086 |
| Date of Birth: | | Sex:    M    Race: WHITE | Facility: | BTF |
| Note Date:    09/13/2025 09:39 | | Provider:    Soheili, Kambiz (MOUD- | Unit: | O01 |

**Reviewed Health Status:**    Yes

Admin Note - Orders encounter performed at Health Services.

**Administrative Notes:**

ADMINISTRATIVE NOTE    1        Provider:   Soheili, Kambiz (MOUD-M) MD

AIC with history of DM, AAA, AF on DOAC, Asthma/COPD, reports about 8:30 AM onset of CP 8/10 presents to medical at 9 AM for triage
He already took 2 NTG SL. Pain radiating to the left shoulder, denying SOB
He has not taken any AM pills, can't state why   missed lisinopril dose - now bp 186/118

A/P:
Left sided CP started 8:30 AM today   8/10 radiating to left shoulder
History of DM, AF, COPD, asthma
On note on TCA   Previous EKG showed AF w/ RVR March 2025

Today EKG AF, slight TWI on V1   new change   septal infarct?
To take AM Rx that missed now: Apixaban and Lisinopril
Ordered Metoprolol 12.5 MG x 1 as Bp remain at 175/137 w/ HR 106
s/p another SL NTG 0.4 MG now   CP from now at 6/10
Called Duke Regional and Dr. Schultz ED accepted AIC

**Allergies:**

| Allergy | Reaction | Comments |
|---|---|---|
| No Known Allergies | | |

Allergies list reviewed/updated for the presence or absence of allergies, sensitivities, and other reactions to drugs, materials, food and environmental factors with the patient on 09/13/2025 09:39 by Soheili, Kambiz (MOUD-M) MD

**Temperature:**

| Date | Time | Fahrenheit | Celsius | Location | Provider |
|---|---|---|---|---|---|
| 09/13/2025 | 09:28 BUX | 97.5 | 36.4 | Forehead | Sanneh, Dauda RN |

**Pulse:**

| Date | Time | Rate Per Minute | Location | Rhythm | Provider |
|---|---|---|---|---|---|
| 09/13/2025 | 09:28 BUX | 106 | Via Machine | Regular | Sanneh, Dauda RN |

**Respirations:**

| Date | Time | Rate Per Minute | Provider |
|---|---|---|---|
| 09/13/2025 | 09:28 BUX | 18 | Sanneh, Dauda RN |

**Blood Pressure:**

| Date | Time | Value | Location | Position | Cuff Size | Provider |
|---|---|---|---|---|---|---|
| 09/13/2025 | 09:28 BUX | 175/137 | Left Arm | Lying | Adult-large | Sanneh, Dauda RN |

**SaO2:**

| Date | Time | Value(%) | Air | Provider |
|---|---|---|---|---|
| 09/13/2025 | 09:28 BUX | 100 | Room Air | Sanneh, Dauda RN |

See Amendment

<u>Exhibit F-17:</u>

# Bureau of Prisons
# Health Services
# Clinical Encounter - Administrative Note

| | | | | | |
|---|---|---|---|---|---|
| Inmate Name: | GRIFFIN, RONNIE | | | Reg #: | 50113-086 |
| Date of Birth: | ▮▮▮▮▮ | Sex: | M　Race:WHITE | Facility: | BTF |
| Note Date: | 09/13/2025 10:04 | Provider: | Soheili, Kambiz (MOUD- | Unit: | O01 |

**Reviewed Health Status:** Yes

Admin Note - Orders encounter performed at Health Services.

**Administrative Notes:**

    ADMINISTRATIVE NOTE　1　　　　Provider: Soheili, Kambiz (MOUD-M) MD

        AIC with history of DM, AAA, AF on DOAC, Asthma/COPD, reports about 8:30 AM onset of CP 8/10 presents
        to medical at 9 AM for triage
        He already took 2 NTG SL. Pain radiating to the left shoulder, denying SOB
        He has not taken any AM pills, can't state why　missed lisinopril dose - now bp 186/118

        A/P
        Left sided CP started 8:30 AM today　8/10 radiating to left shoulder
        History of DM, AF, COPD/Asthma
        On note on TCA　Previous EKG shows AF w/ RVR March 2025

        Today EKG AF, slight TWI on V1　new change　septal infarct?
        To take AM Rx that missed now: Apixaban and Lisinopril
        Ordered Metoprolol 12.5 MG x 1 as Bp remains at 175/137 w/ HR 106
        Ordered ASA 325 chewable x 1 po now
        s/p another SL NTG 0.4 MG now　CP from 8 now at 6/10
        Called Duke Regional and Dr. Schultz ED accepted AIC

**New Medication Orders:**

| <u>Rx#</u> | <u>Medication</u> | <u>Order Date</u> |
|---|---|---|
| | Aspirin 325 MG Tablet | 09/13/2025 10:04 |

        **Prescriber Order:**　　325 MG Orally one time x 1 day(s) -- ASA 325 chewable x 1 for chest pain

        Indication: Pain, unspecified

        Start Now: Yes

            Night Stock Rx#:

            Source: Pyxis

            Admin Method: Self Administration

            Stop Date: 09/14/2025 10:03

            MAR Label: 325 MG Orally one time x 1 day(s) -- ASA 325 chewable x 1 for chest pain

            One Time Dose Given: No

**Copay Required:** No　　　　　　**Cosign Required:** No

**Telephone/Verbal Order:** No

Completed by Soheili, Kambiz (MOUD-M) MD on 09/13/2025 10:06

Exhibit F-18:

Griffin, Ronnie (MRN D3885427)

# Griffin, Ronnie

MRN: D3885427

**ED** 9/13/2025
Status: Discharged
Duke Regional Hospital Emergency Department

# Imaging

## Results

| Procedure | Component | Value | Ref Range | Date/Time |
|---|---|---|---|---|
| X-ray chest single view portable [887208735] | | | | Collected: 09/13/25 |
| Order Status: Completed | | | | Updated: 09/13/25 2314 |

Narrative:

EXAM: Portable chest AP upright, 1357 hours on 9/13/2025

INDICATION: Chest pain.

COMPARISON: None available

TECHNIQUE: AP portable view of the chest was performed.

FINDINGS: Overlying cardiac monitoring leads. Other the right diaphragm. No acute bony abnormalities noted. Cardiac silhouette upper normal size for portable technique. Marked mediastinal and hilar contours. Minimal bibasilar atelectasis.

1.3 x 0.5 cm density projects over the right midlung at the level of the right sixth posterior rib. Summation shadows from overlapping ribs and bronchovascular markings or small inflammatory nodule or favored. Follow-up films are recommended when feasible to verify resolution. No detectable pleural effusion, pneumothorax, or acute airspace consolidation otherwise noted.

Unexpected finding reported in EPIC: Right midlung nodular density.

IMPRESSION:
1. Minimal bibasilar atelectasis. Nonspecific elevated right diaphragm.
2. Thickened curvilinear density projects over the sixth right posterior rib, which may represent inflammatory nodule or summation shadows from overlapping rib shadows and bronchovascular markings. Follow-up PA and lateral views are recommended when feasible to see if this persists.
3. No acute abnormalities otherwise seen.

Electronically Signed by: Andrew Choi, MD, Durham Radiology
Electronically Signed on: 9/13/2025 11:13 PM

Griffin, Ronnie (MRN D3885427) Printed by Rayburn, Barbara [BJR59] at 9/23/2025 9:04 AM

Exhibit F-19:

# Bureau of Prisons
# Health Services
# Clinical Encounter

| | | | | |
|---|---|---|---|---|
| Inmate Name: | GRIFFIN, RONNIE | | Reg #: | 50113-086 |
| Date of Birth: | ███████ | Sex: M  Race: WHITE | Facility: | BTF |
| Encounter Date: | 09/13/2025 20:56 | Provider: Mercado, H. RN | Unit: | O01 |

**Reviewed Health Status:**   Yes

Nursing - Medical Trip Return encounter performed at Health Services.

## SUBJECTIVE:

COMPLAINT  1          Provider:  Mercado, H. RN

Chief Complaint:   Medical Trip Return

Subjective:    AIC comes back from OSH same day. for chest pain and high blood pressure.  " i feel much better to go back"

Pain:          No

## Allergies:

| Allergy | Reaction | Comments |
|---|---|---|
| No Known Allergies | | |

Allergies list reviewed/updated for the presence or absence of allergies, sensitivities, and other reactions to drugs, materials, food and environmental factors with the patient on 09/13/2025 20:56 by Mercado, H. RN

## OBJECTIVE:
### Temperature:

| Date | Time | Fahrenheit | Celsius | Location | Provider |
|---|---|---|---|---|---|
| 09/13/2025 | 20:59 BUX | 97.6 | 36.4 | | Mercado, H. RN |

### Pulse:

| Date | Time | Rate Per Minute | Location | Rhythm | Provider |
|---|---|---|---|---|---|
| 09/13/2025 | 20:59 BUX | 100 | | | Mercado, H. RN |

### Respirations:

| Date | Time | Rate Per Minute | Provider |
|---|---|---|---|
| 09/13/2025 | 20:59 BUX | 16 | Mercado, H. RN |

### Blood Pressure:

| Date | Time | Value | Location | Position | Cuff Size | Provider |
|---|---|---|---|---|---|---|
| 09/13/2025 | 20:59 BUX | 131/86 | Left Arm | Sitting | Adult-regular | Mercado, H. RN |

### SaO2:

| Date | Time | Value(%) | Air | Provider |
|---|---|---|---|---|
| 09/13/2025 | 20:59 BUX | 100 | | Mercado, H. RN |

## ASSESSMENT:

No Significant Findings/No Apparent Distress

AIC comes back from OSH same day. for chest pain and high blood pressure.  " i feel much better to go back"

AIC was alert and oriented X3. Inmate was asked about his name and reg # and he responded with no hesitation and correctly. Inmate vital signs are under the normal range.

| Inmate Name: GRIFFIN, RONNIE | | | | | Reg #: | 50113-086 |
| Date of Birth: | | Sex: | M | Race: WHITE | Facility: | BTF |
| Encounter Date: 09/13/2025 20:56 | | Provider: Mercado, H. RN | | | Unit: | O01 |

## PLAN:

**Disposition:**

Discharged to Housing Unit with Convalescence
Follow-up at Sick Call as Needed

## Patient Education Topics:

| Date Initiated | Format | Handout/Topic | Provider | Outcome |
|---|---|---|---|---|
| 09/13/2025 | Counseling | Access to Care | Mercado, H. | Verbalizes Understanding |

**Copay Required:** No          **Cosign Required:** Yes

**Telephone/Verbal Order:** No

Completed by Mercado, H. RN on 09/13/2025 21:02

Requested to be cosigned by  Rodriguez Irizarry, O. (MOUD) NP-C.

Cosign documentation will be displayed on the following page.

Requested to be reviewed by  Rogers, Richard (MOUD) MD.

Review documentation will be displayed on the following page.

Exhibit F-21:

# Bureau of Prisons
# Health Services
# Clinical Encounter

| | | |
|---|---|---|
| Inmate Name: GRIFFIN, RONNIE | | Reg #: 50113-086 |
| Date of Birth: | Sex: M   Race: WHITE | Facility: BTF |
| Encounter Date: 10/28/2025 09:22 | Provider: Carrero, J. RN | Unit: O01 |

**Reviewed Health Status:** Yes

Nursing - Sick Call Note encounter performed at Health Services.

**SUBJECTIVE:**

COMPLAINT 1          Provider: Carrero, J. RN

Chief Complaint:  Other Problem

Subjective:   "I have blisters on my leg."

**Pain:**      Yes

**Pain Assessment**

| | |
|---|---|
| Date: | 10/28/2025 09:24 |
| Location: | Other |
| Quality of Pain: | Sharp |
| Pain Scale: | 9 |
| Intervention: | eval |
| Trauma Date/Year: | |
| Injury: | Right shoulder dislocations |
| Mechanism: | Multiple episodes of Fall |
| Onset: | 1 Month |
| Duration: | 1 Month |
| Exacerbating Factors: | movement |
| Relieving Factors: | none |
| Reason Not Done: | |
| Comments: | |

**Allergies:**

| Allergy | Reaction | Comments |
|---|---|---|
| No Known Allergies | | |

Allergies list reviewed/updated for the presence or absence of allergies, sensitivities, and other reactions to drugs, materials, food and environmental factors with the patient on 10/28/2025 09:22 by Carrero, J. RN

**OBJECTIVE:**

**Pulse:**

| Date | Time | | Rate Per Minute | Location | Rhythm | Provider |
|---|---|---|---|---|---|---|
| 10/28/2025 | 09:25 | BUX | 106 | | | Carrero, J. RN |

**Blood Pressure:**

| Date | Time | | Value | Location | Position | Cuff Size | Provider |
|---|---|---|---|---|---|---|---|
| 10/28/2025 | 09:25 | BUX | 151/97 | | | | Carrero, J. RN |

**SaO2:**

| Date | Time | Value(%) | Air | | Provider |
|---|---|---|---|---|---|

# Bureau of Prisons
## Health Services
## Clinical Encounter - Administrative Note

| | | | | | |
|---|---|---|---|---|---|
| Inmate Name: | GRIFFIN, RONNIE | | | Reg #: | 50113-086 |
| Date of Birth: | | Sex: M   Race: WHITE | | Facility: | BTF |
| Note Date: | 10/28/2025 14:59 | Provider: Rodriguez Irizarry, O. | | Unit: | O01 |

**Reviewed Health Status:**   No

Cosign Note - Chart Review encounter performed at Health Services.

**Administrative Notes:**

   ADMINISTRATIVE NOTE   1      Provider:   Rodriguez Irizarry, O. (MOUD) NP-C

      adding to sick call for c/o blisters/ulcers to lower extremities.


Schedule:

| Activity | Date Scheduled | Scheduled Provider |
|---|---|---|
| Follow-up | 10/30/2025 09:30   APP 01 | |

    leg ulceration
    hx of venous insufficiency and lymphedema

**Copay Required:** No       **Cosign Required:** No

**Telephone/Verbal Order:** No

Completed by Rodriguez Irizarry, O. (MOUD) NP-C on 10/28/2025 15:02

Exhibit F-23:

# Bureau of Prisons
## Health Services
## Clinical Encounter

| | | |
|---|---|---|
| Inmate Name: GRIFFIN, RONNIE | | Reg #: 50113-086 |
| Date of Birth: ▮▮▮▮ | Sex: M    Race: WHITE | Facility: BTF |
| Encounter Date: 10/30/2025 12:21 | Provider: Rodriguez Irizarry, O. | Unit: O01 |

**Reviewed Health Status:** Yes

Advanced Practice Provider - Sick Call Note encounter performed at Health Services.

**SUBJECTIVE:**

COMPLAINT  1        Provider:  Rodriguez Irizarry, O. (MOUD) NP-C

Chief Complaint:  Vascular

Subjective:  66 y/o male with PMH of T2DM with diabetic neuropathy, chronic HCV, PAD, COPD/asthma, HTN, HLD, MDD, AAA and hypothyroidism seen for c/o recurrence of ulcerations to LLE with onset of 1wk. Reports developed blisters that busted and now have a small ulceration. Noticed blood on compression stockings. Denies significant LLE edema or pain. No difficulties with ambulation. Denies f/c, night sweats, purulent drainage, HA, CP, dizziness, weakness, SOB, coughing, abd pain, n/v/d/c.

Requests renewal for A&D ointment and ibuprofen.
He also wants to refuse colonoscopy as he reported had one the past that was negative and does want to have any more in the future.

Pain:        Yes

**Pain Assessment**

| | |
|---|---|
| Date: | 10/30/2025 12:24 |
| Location: | Leg-Lower Left Front |
| Quality of Pain: | Burning |
| Pain Scale: | 4 |
| Intervention: | per plan of care |
| Trauma Date/Year: | |
| Injury: | Right shoulder dislocations |
| Mechanism: | Multiple episodes of Fall |
| Onset: | 1-2 Weeks |
| Duration: | 1-2 Weeks |
| Exacerbating Factors: | palpation of wounds |
| Relieving Factors: | unna boot ibuprofen |
| Reason Not Done: | |
| Comments: | |

**Allergies:**

| Allergy | Reaction | Comments |
|---|---|---|
| No Known Allergies | | |

Allergies list reviewed/updated for the presence or absence of allergies, sensitivities, and other reactions to drugs, materials, food and environmental factors with the patient on 10/30/2025 12:21 by Rodriguez Irizarry, O. (MOUD) NP-C

Exhibit F-24:

| Inmate Name: | GRIFFIN, RONNIE | | | | Reg #: | 50113-086 |
|---|---|---|---|---|---|---|
| Date of Birth: | | Sex: | M | Race: WHITE | Facility: | BTF |
| Encounter Date: | 10/30/2025 12:21 | Provider: | Rodriguez Irizarry, O. | | Unit: | O01 |

## OBJECTIVE:

**Temperature:**

| Date | Time | Fahrenheit | Celsius | Location | Provider |
|---|---|---|---|---|---|
| 10/30/2025 | 10:00 BUX | 97.8 | 36.6 | | Rodriguez Irizarry, O. (MOUD) NP-C |

**Pulse:**

| Date | Time | Rate Per Minute | Location | Rhythm | Provider |
|---|---|---|---|---|---|
| 10/30/2025 | 10:00 BUX | 100 | | | Rodriguez Irizarry, O. (MOUD) |

**Respirations:**

| Date | Time | Rate Per Minute | Provider |
|---|---|---|---|
| 10/30/2025 | 10:00 BUX | 16 | Rodriguez Irizarry, O. (MOUD) NP-C |

**Blood Pressure:**

| Date | Time | Value | Location | Position | Cuff Size | Provider |
|---|---|---|---|---|---|---|
| 10/30/2025 | 10:00 BUX | 140/75 | | | | Rodriguez Irizarry, O. (MOUD) |

**SaO2:**

| Date | Time | Value(%) | Air | Provider |
|---|---|---|---|---|
| 10/30/2025 | 10:00 BUX | 100 | Room Air | Rodriguez Irizarry, O. (MOUD) NP-C |

### Exam Comments

General: A&O x4, NAD, calm and cooperative.
SKIN: + wounds LLE. Warm and dry. Callous at plantar aspect of L foot that was shaved by PT today.
HEENT: Atraumatic, Symmetric, EOMI, PERRLA.
NECK: FROM to neck, supple.
PULM: Lungs CTA bilat.
CARDIO: S1S2, no m/r/g, no JVD, no edema.
GI: soft, NT, ND, + BS x4.
MSK: Ambulates w/o difficulties with steady gait via walker. FROM to BUE and BLE.
PERIPHERAL VASCULAR: + dorsalis pedis, cap refill <3sec. 3 healing ulcerations of 1-1.5cm to anterior, lateral, and posterior aspect of LLE with granulating tissue w/ minimal amount of serosanguineous drainage. No surrounding erythema. No edema to BLE.
NEURO: CN 2-12 intact. No focal neurological deficit.

## ASSESSMENT:

Non-pressure chronic ulcer of other part of foot, L97509 - Current

## PLAN:

**Renew Medication Orders:**

| Rx# | Medication | Order Date |
|---|---|---|
| 2064098-BUX | Ibuprofen 800 MG Tab | 10/30/2025 12:21 |

**Prescriber Order:** Take one tablet (800 MG) by mouth three times daily AS NEEDED or as directed by provider. PRN x 30 day(s)

Indication: Other specified diabetes mellitus with foot ulcer

| Rx# | Medication | Order Date |
|---|---|---|
| 2064106-BUX | Vitamin A & D Ointment 60 GM | 10/30/2025 12:21 |

**Prescriber Order:** Apply topically to the affected area(s) twice daily x 83 day(s)

Indication: Type 2 diabetes mellitus with diabetic neuropathy

Exhibit F-25:

| Inmate Name: GRIFFIN, RONNIE | | | | | Reg #: 50113-086 | |
|---|---|---|---|---|---|---|
| Date of Birth: | | | Sex: M Race: WHITE | | Facility: BTF | |
| Encounter Date: 10/28/2025 09:22 | | | Provider: Carrero, J. RN | | Unit: O01 | |

| **Date** | **Time** | **Value(%) Air** | | **Provider** |
|---|---|---|---|---|
| 10/28/2025 | 09:25 BUX | 97 | | Carrero, J. RN |

## ASSESSMENT:

Other

The patient reports to medical services because he has noticed blisters on his leg that have burst and are causing him a lot of pain. He also has a diabetic ulcer and claims that it is reopening. The patient denies chest pain or respiratory problems.

## PLAN:

## Disposition:

Follow-up at Sick Call as Needed

## Patient Education Topics:

| Date Initiated | Format | Handout/Topic | Provider | Outcome |
|---|---|---|---|---|
| 10/28/2025 | Counseling | Access to Care | Carrero, J. | Verbalizes Understanding |

**Copay Required:** No          **Cosign Required:** Yes

**Telephone/Verbal Order:** No

Completed by Carrero, J. RN on 10/28/2025 12:50

Requested to be cosigned by Rodriguez Irizarry, O. (MOUD) NP-C.

Cosign documentation will be displayed on the following page.

Griffin, Ronnie (MR # D3885427) DOB: ███████  Encounter Date: 08/07/2025



## Exhibit G-2:

Griffin, Ronnie (MR # D3885427) DOB: █████████ Encounter Date: 08/07/2025



## Vascular Exam

|  | Right | Left |
|---|---|---|
| Dorsalis Pedis | 2+ | 2+ |
| Posterior Tibial | 2+ | 2+ |

T= triphasic signal, B= biphasic signal, M= monophasic signal

**DATA:**
I independently reviewed and interpreted the images.

**DIAGNOSTIC STUDIES REVIEWED:**
Normal arterial perfusion. Right first toe amputation.

February 2021    Hepatitis C Treatment Algorithm/Nonformulary Request Worksheet

U.S. DEPARTMENT OF JUSTICE                FEDERAL BUREAU OF PRISONS

| | |
|---|---|
| Inmate Name: Griffin, Ronnie | Projected Release Date: 7-16-28 |
| Register Number: 50113-086 | Weight (lb.): 234 (within 90 days of request) |
| APRI Score: 0.4    APRI Date: 12-19-24 | HCV Genotype: ☒1a ☐1b ☐2 ☐3 ☐4 ☐5 ☐6 |
| APRI = ((AST/ULN AST)/Plt) x 100 | |

CTP Score (if cirrhotic):    Date:

POINTS (circle):    1    2    3
Albumin (g/dL):    ☐ >3.5 ☐ 2.8-3.5 ☐ <2.8
Bilirubin (mg/dL): ☐ <2 ☐ 2-3 ☐ >3
INR:    ☐ <1.7 ☐ 1.7-2.3 ☐ >2.3
Encephalopathy: ☐ none ☐ grade 1-2 ☐ grade 3-4
Ascites:    ☐ none ☐ diuretic ☐ diuretic
            responsive refractory

Liver Biopsy Result (amount of fibrosis):
    Date Performed:    ☐ Not Performed
☐ Portal ☐ Periportal ☐ Bridging ☐ Cirrhosis ☐
None
Note: For regimens with elbasvir/grazoprevir in the treatment of HCV genotype 1a, an HCV NS5A virologic resistance test is required.

Prior Antiviral Treatment for HCV: ☒ No ☐ Yes    If yes, answer the following:

Drug Names and Dosages:
Start Date:        Stop Date:        Reason stopped:
Prior Treatment Response ☐ SVR ☐ Relapser ☐ Partial Responder ☐ Null Responder

Requested Treatment Regimen (check all that apply):

☐ Ledipasvir/sofosbuvir (Harvoni®)
☐ Elbasvir/grazoprevir (Zepatier®)
☐ Sofosbuvir/velpatasvir (Epclusa®)
☐ Ribavirin        ☐ Other_____
☐ Glecaprevir/pibrentasvir (Mavyret™)
☐ Sofosbuvir/velpatasvir/voxilaprevir (Vosevi®)

Eligibility Criteria:

☒ Sentenced inmate with sufficient time remaining on sentence to complete a course of treatment prior to halfway house (RRC), home confinement, or GCT/Full Term release, and Life Expectancy > 18 mo.
☒ Inmate is willing and able to adhere to a rigorous treatment regimen (no documented non-adherence to prior therapy, failure to complete pretreatment evaluation process, or unwillingness to commit or consent to HCV treatment).
☒ No contraindications or drug interactions with requested treatment regimen
☒ No uncontrolled or unstable medical or mental health conditions.
☐ No current pregnancy

Health Services Staff Name / Signature / Date / Institution

Richard Rogers, MD    [signature]    4-23-25    FCI2

Documentation - include copies of the following with the BEMR non-formulary request:

☒ CBC, serum creatinine and eGFR, liver panel, INR (dated within 180 days of request)
☒ HCV RNA viral load (reported as IU/ml) (anytime prior to treatment)
☒ HCV genotype (anytime prior to treatment) if not treatment naïve or a candidate for simplified treatment.
☒ HIV Ab - if positive, include CD4 and HIV viral load (dated within 180 days of request) and current antiretroviral medication regimen
☒ Hepatitis B serology (sAb, sAg, and cAb) - if HBsAg reactive, include eAg, eAb, and HBV DNA viral load
☐ Liver biopsy report (if performed, but not required unless clinically indicated)
☐ If cirrhosis or APRI ≥ 2 (defined by pathology or clinical findings), include abdominal US or CT
☐ Pregnancy test if woman with child-bearing potential (dated within 90 days of request)

PROCEDURE FOR SUBMITTING HCV TREATMENT REQUEST
    - Generate a BEMR non-formulary request (NFR) for Hepatitis C Treatment Algorithm.
    - Include all information and attach all required documentation from above.
    - May scan and attach Hepatitis C Treatment Algorithm Nonformulary Request Worksheet to NFR.

Exhibit I-1:

CAMPAIGNS

# Under Dr. Death's Care: Kenneth Kocher's Struggle for Survival

929 224
0386

Intake @
the remedy pro.
0

**Author: Ria Bhutani**
**Artist: Mia Bracall**



In 2018, Kenneth Kocher, a member of the Remedy Project, arrived at a Texas hospital in distress, suffering from severe chest pain. His medical visit raised serious concerns among the attending doctors, yet the hospital staff failed to document or address the potentially life-threatening conditions he faced. Nearly seven years later, Mr. Kocher remains trapped in a relentless battle with his health, accompanied by a pattern of medical neglect at FCI Butner that continues to jeopardize his life.

After his initial hospital visit, Mr. Kocher endured two years of terrifying episodes of syncope (loss of consciousness) and excruciating chest pain—conditions that went untreated. Each day was a struggle against an invisible enemy, as he lived

**Take Action for Kenneth Kocher**

## Take Action for

In constant fear of when the next attack would strike, never knowing if he would wake up from it. Despite his pleas for help, his suffering was met with silence, leaving him alone with his distress. In 2020, a single visit with a physician offered a brief glimmer of hope, as he was finally able to receive attention for his worsening heart and lung conditions. Yet, even then, discrepancies between verbal diagnoses and his official medical records persisted, leaving him trapped in his unaddressed discomfort.

The next two years passed in a haze of pain and uncertainty. Mr. Kocher once again requested access to his medical records, which he was denied until three long months had passed. Even after receiving these records, there was no follow-up, no medical provider to explain his condition, and no specialists consulted. During this time, the staff at FCI Butner withdrew his hypertension medication, worsening his condition and leading to clear and noticeable unsteadiness and pain. Still, no action was taken to address his pressing conditions.

**"Sometimes I wonder if I'm even gonna live long enough to see my release."**

In 2024, Kocher experienced another devastating syncope attack- the culmination of years of neglect and untreated medical issues. He was rushed to the hospital, where Dr. Bryd and his team of cardiologists issued clear and urgent recommendations: Mr. Kocher should be discharged with a LifeVest to monitor his heart rhythms, followed by an implantable loop recorder (ILR) to further track any abnormalities. These recommendations, designed to save his life, were ignored by FCI Butner's staff physician, Dr. Patrick Craft. Not only did Dr. Craft remove the LifeVest, but he also failed to provide the life-saving ILR device and even threatened Mr. Kocher with harm. By disregarding the medical advice of specialists, Dr. Craft has left Mr. Kocher at grave risk, a life hanging in the balance because of systemic medical neglect.

**"Dr. Patrick Craft has earned himself the nickname Dr. Death here among the inmates and guards alike."**

Kocher's suffering doesn't end with his syncope condition. He also faces severe, untreated pulmonary and urological concerns—issues that have gone ignored by FCI Butner staff. These are not isolated failings; they represent a systemic disregard for Mr. Kocher's health and basic human rights. The Federal Bureau of Prisons Handbook clearly outlines the responsibilities of prison officials to provide medical care, yet FCI Butner has violated these mandates at every turn. These violations go beyond medical malpractice—they represent a breach of Mr.

# Kenneth Kocher

Please set your address to: 2 OLD 75 HWY, BUTNER, NC 27509

## Contact Information

First Name

Exhibit I-2

Last Name

Street Address

Postal Code

Email

email@email.com

Mobile Phone (Optional)

☑ Yes, sign me up for email updates.

## Additional Information

Are you a student?

Have you or a loved one been incarcerated?

Personalize your subject

Egregious Medical Neglect at FCI Butner

Dear [target],

I write to you today regarding Mr. Kenneth Kocher (#60361-177) a man experiencing medical neglect at FCI Butner Medium II.

Please note - the following message is NOT a request for release of information about Mr. Kocher. Mr. Kocher has

Kocher's 8th Amendment rights, which protect all Americans from cruel and unusual punishment.

Mr. Kocher's suffering is not just an individual tragedy—it is a call to action. No one, regardless of their circumstances, should be subjected to such relentless neglect and pain. We demand that Mr. Kocher receive the implantable loop recorder recommended by his doctors and be scheduled for necessary cardiology follow-ups. We insist that he be given timely appointments with pulmonology and urology specialists before his conditions worsen further. Most urgently, we demand that Mr. Kocher be placed under the care of a physician other than Dr. Craft, who has proven time and again that he cannot be trusted with Mr. Kocher's well-being.

The cruel and unrelenting neglect that Mr. Kocher has endured must be addressed. The staff at FCI Butner, including Dr. Patrick Craft, must be held accountable for their negligence and violation of Mr. Kocher's rights. Suffering from even one medical condition in a U.S. prison is painful enough, and Mr. Kocher faces the discomfort of fighting several possible diagnoses. No one, regardless of their circumstances, deserves to endure such pain, discomfort, and fear accompanied by complete and ruthless neglect. Kenneth Kocher deserves his right to treatment and medical attention.

Remedy Project
929-224-0380

filed the appropriate administrative remedies on the below issues at FCI Butner Medium II where the original abuse occurred, and is in the process of filing more.

Personalize your message

Mr. Kenneth Kocher is a man incarcerated at FCI Butner Medium II, a federal prison within your jurisdiction. Mr. Kocher has suffered from misdiagnosed and untreated severe cardiac issues for the past 7 years. Although he was not sentenced to death, he fears he will not see his release date as a result of the FCI Butner's medical staff's inhume and illegal conduct.

Mr. Kocher is the patient of Dr. Patrick Craft, nicknamed "Dr. Death" by both prisoners and guards. Since 2020, despite severe symptoms, Dr. Craft took away his his hypertension medication, worsening his condition and leading to clear and noticeable unsteadiness and pain. In 2024, Kocher experienced a syncope attack– the culmination of years of neglect and untreated medical issues. He was rushed to the hospital, where an outside physician, Dr. Bryd, and his team of cardiologists issued clear and urgent recommendations: Mr. Kocher should be discharged with a LifeVest to monitor his heart rhythms, followed by an implantable loop recorder (ILR) to further track any abnormalities. These recommendations were ignored by FCI Butner's staff physician, Dr. Patrick Craft. Not only did Dr. Craft remove the LifeVest, but he also failed to provide the life-saving ILR device and threatened Mr. Kocher with harm. By disregarding the medical advice of specialists, Dr. Craft has put Mr. Kocher's life at risk.

Mr. Kocher also faces severe, untreated pulmonary and urological concerns— issues that have gone ignored by FCI Butner staff. These are not isolated failings; they represent a systemic disregard for Mr. Kocher's health and basic human rights. The Federal Bureau of Prisons Handbook clearly outlines the responsibilities of prison officials to provide medical care, yet FCI Butner has violated these mandates beyond medical malpractice. Staff's actions are ultimately a severe breach of Mr. Kocher's 8th Amendment rights.

Sincerely,
[Your information here]

Next

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, <br> Plaintiff/Respondent, <br> vs. <br> DERNEVAL DIMMER, <br> Defendant/Petitioner. | Case Nos. 3:12-cr-00035-TMB-1 <br> 3:12-cr-00056-TMB-7 <br><br> **DECLARATION OF PHILLIP WISE** |

I, PHILLIP S. WISE, hereby declare in support of the pending compassionate release motion the following:

**BACKGROUND, TRAINING AND EXPERIENCE**

1.    From 1999 until my retirement in February 2002, I served as the Assistant Director of the Federal Bureau of Prisons, with responsibility for Health Care for the agency.

2.    In this position, I was responsible for the formulation and implementation of health care policies for the agency and served as a member of the Executive Staff which is the senior policy making body of the Bureau.

3.    For three years prior to that, I was the Warden of the Federal Medical Center (of the Federal Bureau of Prisons) at Rochester, Minnesota, where I had overall operational responsibility for that facility. While in this position, I was appointed to the Senior Executive Service of the U.S. Government. For two years prior to that, I was the Warden of the Federal Prison Camp at Alderson, W.V. My career with the Federal Bureau of Prisons dates back to 1977, and my assignments with the Bureau of Prisons include service in Federal Penitentiaries, Federal Prison Camps, Federal

Exhibit J-2:

Medical Centers, and Federal Correctional Institutions. I am fully familiar with the health care and inmate management policies of that organization.

4. From December 2003 through September 2005, I was employed as Vice President of a national firm that provided specialty medical care to inmates in federal and private correctional facilities.

5. Since my retirement from the Bureau of Prisons, I have maintained current knowledge of changes in its health care policies and practices through contact with current BOP officials; monitoring published changes in policy; review of reports and documents issued by BOP, the U.S. Department of Justice, and outside agencies; review of testimony of BOP officials before oversight bodies as well as court testimony, and through request for information from the BOP through the Freedom of Information Act.

6. A copy of my resume which includes my relevant work experience is attached (Attachment 1).

**DOCUMENTS AND MATERIALS REVIEWED**

7. In preparation of this statement, I have reviewed the following Program Statements of the Federal Bureau of Prisons: Inmate Security Designation and Custody Classification (September 12, 2006, change 1 2019); Patient Care (6/13/2014), Medical Designations and Referral Services for Federal Prisoners (1/15/2005), Health Services Administration (6/2014), Pharmacy Services (1/15/2005); the National Formulary of the Federal Bureau of Prisons for Winter 2022; Care Level

*United States v. Derneval Dimmer*
Case No. 3:12-cr-00035-TMB-1                                                                 Page 2

Exhibit J-3:

Classification for Medical and Mental Health Conditions or Disabilities, Clinical Guidance, May 2019; and the website for the Federal Bureau of Prisons (www.bop.gov).

8. In addition, I reviewed medical records from the Bureau of Prisons describing Mr. Dimmer's medical care between June 3, 2022 and January 25, 2023.

9. From the information available to me, it appears that Mr. Dimmer is a 45 year-old individual currently incarcerated at FCI Florence who has been diagnosed with Stage III colorectal cancer. Mr. Dimmer has been referred for surgical treatment and chemotherapy.

10. Mr. Dimmer reported blood in his feces on June 3, 2022. It was not until November 2022 that he received a colonoscopy and biopsy which was positive for adenocarcinoma.

## SUMMARY OF OPINION

11. In my opinion, Mr. Dimmer and the Bureau of Prisons will face the following challenges in providing adequate medical care:

    (1) Mr. Dimmer will likely need to be placed at a higher-level medical facility that can provide oncology support.

    (2) The scope of care available and his access to medical specialists at this facility will be more limited than in the community. In particular, Mr. Dimmer will not have access to experimental therapies or treatment which

*United States v. Derneval Dimmer*
Case No. 3:12-cr-00035-TMB-1

Page 3

Exhibit J-4:

would be available to someone receiving treatment in a private medical setting.

(3)    The effective management of chronic conditions over time is difficult in a correctional setting. Mr. Dimmer will have greater difficulty monitoring and treating his condition. For example, if he experiences a medical emergency while undergoing immunotherapy or recovering from surgery, he may experience a delay before he will be assessed by a medical provider.

(4)    While incarcerated, Mr. Dimmer will be more exposed to infections and will be more vulnerable to serious disease while his immune system is compromised. Persons undergoing chemotherapy who are advised to refrain from interacting with others will be unable to do so in a congregate setting where persons eat, recreate and sleep in the same space.

## BUREAU OF PRISONS CLASSIFICATION SCHEME FOR MEDICAL CARE

12.    The Bureau of Prisons classifies its institutions based on the level of medical care each is capable of providing. This classification is based in part on the resources available in the surrounding community and in part on the staffing of the medical component of that facility.

13.    Each facility is assigned a care level (I-IV), with care Level I providing the lowest level of medical care and generally housing "healthy" inmates, and Level IV providing the highest level of care to include inpatient beds and 24-hour nursing care.

Exhibit J-5:

14. Mr. Dimmer would likely be placed at a care level IV facility. This is based on his ongoing treatment for cancer. The Bureau of Prisons currently operates seven Care Level IV facilities:

> Federal Medical Center, Devens, Massachusetts
>
> Federal Medical Center, Butner, North Carolina
>
> Federal Medical Center, Lexington, Kentucky
>
> Federal Medical Center, Carswell (Fort Worth) Texas (for women only)
>
> Federal Medical Center, Rochester Minnesota
>
> U.S. Medical Center for Federal Prisoners, Springfield, Missouri
>
> Federal Correctional Institution, Fort Worth, Texas.

15. Of these, the Federal Medical Center, Butner, North Carolina serves as the oncology center for the BOP, and it is highly likely that Mr. Dimmer will be incarcerated at that facility. FMC Butner has an oncology unit with a medical oncologist and support available staff onsite.

16. Each of these medical facilities is considered "administrative", meaning that each has multiple missions and houses inmates of multiple security levels. Thus, minimum security level inmates in these facilities are subjected to more rigorous security procedures than they would experience in a minimum security (camp) setting. In addition, they live and interact with inmates with significantly greater histories of criminal activity, including histories of violence.

*United States v. Derneval Dimmer*
Case No. 3:12-cr-00035-TMB-1

Page 5

Exhibit J-6:

## LIMITED SCOPE OF CARE AND ACCESS TO MEDICAL SPECIALISTS

17.    Attachment #2 contains an overview of the structure of health care in the Bureau of Prisons.

18.    While the Bureau of Prisons seeks to provide medically necessary care for its inmates, it may decline to provide all medically appropriate care.

19.    In Mr. Dimmer's case, for example, he will not receive any medical care that is not FDA-approved. This means that innovative or experimental treatments that are undergoing clinical trials are not available to inmates in BOP custody.

20.    Pain management is difficult in a correctional setting. Medications that have a high potential for abuse, such as narcotics, barbiturates, or minor tranquilizers present particular difficulties in a correctional setting. Not only are clinicians in a correctional setting sensitive to drug seeking behavior, but prescription of such medications places the inmate for whom they are prescribed in a precarious position with other drug seeking inmates in the population. He or she is likely to receive pressure, which may be in the form of threats, to illicitly feign the consumption of his medication and then re-distribute it. For these reasons, clinicians in correctional settings are generally reluctant to prescribe these medications unless absolutely medically necessary and no reasonable alternative exists.

21.    If Mr. Dimmer requires emergency medical care, he will not be able to self-refer to a medical provider or directly contact a medical specialist like an oncologist or pain management specialist. While the Bureau of Prisons facilities typically have a

*United States v. Derneval Dimmer*
Case No. 3:12-cr-00035-TMB-I                                                              Page 6

number of medical specialists available under contract provisions, individual access to those clinicians is limited by an administrative policy that requires multiple levels of review.

22. If Mr. Dimmer experiences a spike in temperature, or suffers from diarrhea or vomiting caused by chemotherapy, he will encounter delays before being seen by a medical provider from his oncology treatment center.

23. This limited scope of care applies to medications, as well as evaluations and interventions, and represents a more limited scope than is available to him in the community.

**CHRONIC CARE**

24. Mr. Dimmer will likely be enrolled in a "chronic care clinic", a computerized scheduling device to ensure an individual is seen by a clinician (usually a physician assistant, nurse practitioner, or other mid-level provider) for one or more chronic conditions on a regular basis (at least once annually).

25. A review of medical care in the BOP conducted by the Inspector General of the U.S. Department of Justice in 2008[1] indicated that in about 16% of the cases, the expected care for chronic conditions was not provided. The BOP has not published any more recent data to indicate a change in those outcomes.

---

[1] *Federal Bureau of Prisons' Efforts to Manage Inmate Health Care,* U.S. Dept. of Justice Office of the Inspector General Audit Division Audit Report 08-08 (Feb. 2008), available at https://bit.ly/3kECvQ7.

*United States v. Derneval Dimmer*
Case No. 3:12-cr-00035-TMB-1

Page 7

26. Chronic care is often difficult in the BOP due to clinical staff shortages. A 2016 report by the Office of Inspector General[2] outlines the historic and current difficulty the BOP has recruiting and retaining clinical staff.

27. Those shortages are further exacerbated by staffing shortages in other areas of operations due to understaffing and COVID-19, resulting in the implementation of a policy known as "augmentation" under which staff from all departments, including medical services are re-assigned on a daily basis to cover critical custody posts. As a result, a nurse may be assigned to manage a housing unit rather than providing nursing care.

**COVID-19**

28. COVID-19 infections among inmates have occurred at a much higher rate than in the community, likely based on the close living quarters, difficulty in isolating or quarantining individuals in a timely manner, minimal testing, and delay in providing sufficient vaccinations and boosters.

29. It is not possible in a correctional setting to practice social distancing as recommended by CDC, and in spite of limited activities, people, including staff and contractors are constantly moving in and out of these facilities.

---

[2] *Review of the Federal Bureau of Prisons' Medical Staffing Challenges*, U.S. Dept. of Justice Office of the Inspector General, Evaluation and Inspections Division 16-02 (March 2016), available at https://bit.ly/3WwofpF.

Exhibit J-9:

30. At the Federal Medical Center, Butner, NC there is 1 confirmed inmate cases of COVID-19, and 2 staff members are currently diagnosed. There has been a total of 6 inmate deaths from COVID-19 at the Federal Medical Center, Butner.

31. Not only will Mr. Dimmer be more exposed to the coronavirus in custody, but he has a risk factor for a more serious outcome if infected as identified by CDC. His debilitated state following immunotherapy, surgery, radiation would likely further place him at risk for serious outcome if infected.

**SUMMARY**

32. I do not make sentencing recommendations, as that is exclusively the purview of the Court. Mr. Dimmer suffers from a life-threatening form of cancer that requires urgent treatment. The quality of the medical care he can expect to receive while in BOP custody will be more restricted than what he can receive if he is released to the community and care in the community is likely to be more timely and cost effective without the imposition of custodial requirements. Home confinement can provide him with the supportive services he requires, greater access to innovative treatments, as well as the ability to maintain social distancing to diminish exposure to COVID-19.

I declare under penalty of perjury that the foregoing is true and correct.

Executed at Sparta, Georgia, on 01 February, 2023.

PHILLIP WISE

*United States v. Derneval Dimmer*
Case No. 3:12-cr-00035-TMB-1

Page 9

## Exhibit J-10:

(Blank Page in Declaration: See Bottom Case Number and Page No:)

## ATTACHMENT #1
### Resume for

Phillip Steven Wise
140 Parham Rd. N.W.
Milledgeville, Georgia 31061
Phone: 478-968-7907
Cellphone: 478-456-4904
Email: pswise@msn.com

## PERSONAL INFORMATION

Date and place of birth: December 2, 1951, Atlanta, Georgia
Family: Married to Dianne Wise since December 28, 1974
One son, Joshua, former Petty Officer aboard the USS Avenger, MCM-1,
Hobbies/interests: Running, bicycling, cooking, traveling, gardening

## EDUCATION

High School:
Danbury High School
Danbury, Connecticut
Graduated June 1969

Undergraduate Studies:
Emory University
Atlanta, Georgia
Enrolled September 1969
Awarded BA (major in Psychology) August 1972
Awards: Phi Beta Kappa

Graduate School
University of Minnesota
Center for Research in Human Learning
September 1972 through May 1973

Georgia State University
School of Education
Enrolled 1975
Awarded M.Ed. (Counseling and Psychological Services) March 1977

## RELEVANT EMPLOYMENT

Page 11 of 21

Exhibit J- 12:

**Bureau of Prisons**
**Psychology Technician**
U.S. Penitentiary
Atlanta, Georgia
March 1977-September 1978

Major Duties: Administration of psychological assessment instruments; collection, analysis and organization of material for completion of forensic evaluations; group and individual therapy; development and delivery of counselor training; general correctional duties.

**Case Manager**
U.S. Penitentiary
Atlanta, Georgia
September 1978-February 1981

Major Duties: Overall management of the cases of 250 federal convicted felons, to include reception; coordination with courts and pre-trial services; sentence monitoring; development of individual program plans; release planning; coordination with post release services.

**Case management Coordinator**
Federal Correctional Institution
El Reno, Oklahoma
February 1981- February 1983

Major Duties: Coordination of activities of 8 casemangers, development and implementation of local policy regarding inmate management; advise Warden about case management policy; coordinate institution activities with U.S. Parole Commission; coordinate activities related to Interstate Agreement on Detainers, International transfer of inmates, and extradition issues.

**Drug Abuse Treatment Unit Manager**
Federal Correctional Institution
Fort Worth, Texas
February 1983-October 1983

Major duties: Management of a comprehensive, residential drug treatment unit for 200 convicted federal felons; supervision of clinical psychologist, casemanagers, counselors, correctional officers and support staff; general correctional responsibilities.

**Instructor**
Bureau of Prisons Staff Training Academy
Federal Law Enforcement Training Center (FLETC)
Brunswick, Georgia
October 1983-April 1985

Major duties: Instructing new Bureau of Prisons employees in firearms, self-defense, and policy; development and implementation of practical exercises for new employees; development of

Page 12 of 21

Exhibit J-13:

computer based instruction programs; firearms instruction for staff from other federal law enforcement agencies.

**Assistant Regional Administrator for Correctional Programs**
 North Central Regional Office
 Bureau of Prisons
 Kansas City, Missouri
 April 1985 – October 1986
 Major Duties: Assisted the Regional Administrator in the evaluation of correctional programs in the 15 correctional facilities located within the North Central Region; management of inmate pay programs within the region; coordination of activities of the U.S. Parole Commission within the region.

**Regional Administrator, Correctional Programs**
 North Central Regional Office
 Bureau of Prisons
 Kansas City, Missouri
 October 1986 – April 1988
 Major Duties: Provided oversight of correctional programs (including unit management, case management, inmate performance pay, monitoring of disruptive groups, placement of newly sentenced inmates, separation of gang members, placement of federal inmates in state systems and receipt of state inmates in federal facilities), coordination of parole hearings and releases, coordination of release planning and coordination with offices of U.S. Probation, monitoring of interstate agreement on detainers, and coordination of movement of inmates.

**Executive Assistant, Correctional Programs Division**
 Central Office (Headquarters)
 Bureau of Prisons
 Washington, D.C.
 April 1988 – May 1989
 Major Duties: Provided administrative assistance to the Assistant Director of the Bureau of Prisons who was responsible for all correctional programs, including community corrections, case management, unit management, chaplaincy programs, psychology services, and custody and security. Managed transfer of inmates to and from other countries, working with the Department of State to administer international treaties, managed covert operations in conjunction with the Office of Enforcement Operations, Department of Justice.

**National Administrator, Correctional Programs Branch**
 Central Office (Headquarters)
 Bureau of Prisons
 Washington, D.C.
 May 1989 – June 1990

Page 13 of 21

Major Duties: Responsible for development of agency wide policy governing correctional programs, including case management, unit management, and management of disruptive groups. Oversight of programs agency wide in those areas, including a program of regular institution audits. Management of national program for the placement of Mariel Cubans and repatriation of those eligible, in conjunction with the Department of Justice, Department of State, Immigration and Naturalization Service and St. Elizabeth's Hospital. Participation in the development of administration social policy, including sentencing, legislative initiatives, and probation and parole policies.

**Executive Associate Warden**
Federal Correctional Institution
Lexington, Kentucky
June 1990 – July 1991
Major Duties: Responsible for all operational areas of a major correctional facility with both male and female populations and a significant medical mission. Included direct responsibility for budget development and execution, facilities management, food service, health services, personnel, and training.

**Deputy Assistant Director**
Bureau of Prisons
Central Office (Headquarters)
Washington, D.C.
July 1991 – June 1994
Major Duties: Responsible for policy development and oversight of agency activities in information management and technology, research and evaluation, security technology, and international affairs. Oversaw operations of agency information management development, including expansion of legacy system and development of agency wide local and wide area networks, the migration to distributed data bases, and integration of systems with other components of the criminal justice system. Worked collaboratively with U.S. Marshal's Service and Immigration and Naturalization Service to implement a joint automated booking system as a demonstration project in the Vice President's initiative to reinvent government. Participated regularly with Department of Justice and other agency officials in the development of administration policies for the Department and White House regarding criminal justice issues, including sentencing and alternatives to incarceration, probation and parole policies, legislative initiatives and assessment of impact of legislative proposals. Participated in briefings of members of Congress, federal judges, and administration officials. Coordinated international assistance in corrections with Department of State and Department of Justice.

**Warden**
Federal Prison Camp
Alderson, West Virginia
June 1994 – September 1996
Major Duties: Responsible for the overall administration of a major prison camp for federal female offenders, including all operational areas such as custody, financial management with a budget of $20 million, facilities management, personnel and food service, as well as program areas such

Exhibit J-15:

as unit management, case management, chaplaincy and psychology services, education, drug abuse treatment and vocational training programs. Of particular note were programs specifically designed for pregnancy, childbirth, and parenting.

**Warden**

Federal Medical Center for Prisoners
Rochester, Minnesota
September 1996 – March 1999

Major Duties: Responsible for the overall administration of a complex medical facility for federal prisoners, including the highest levels of inmate custody, all operational areas and program areas, an annual budget of $45 million, and management of contractual relationship with the Mayo Clinic. Management of medical and surgical inpatient and outpatient programs and populations, and in-patient, out patient and forensic mental health programs and populations. Responsible for ensuring compliance with all federal health care laws and regulations, ethical medical decision making, and accreditation by external health care review organizations. Responsible for coordination of activities with other components of state and federal criminal justice components, including courts, probation and parole agencies, local, state and federal law enforcement organizations and other Department of Justice components. Participated in the development of health care policies for the Bureau of Prisons. Member of the U.S. Senior Executive Service.

**Assistant Director of the Federal Bureau of Prisons with responsibility for Health Services Division**

Federal Bureau of Prisons
Central Office (Headquarters)
Washington, D.C.
March 1999 – February 2, 2002

Major Duties: Responsible for agency wide programs in health services, food service, and safety, including policy development, integration of services across 93 institutions and 7 major medical referral centers, and oversight of those programs in each facility. Management and oversight of $500 million annual health services/food service budget. Participate as one of 15 members of the agency Executive Staff that makes major agency policy and personnel decisions and collectively directs operations of the agency components. Provide briefings to members of Congress and testimony at relevant Congressional hearings, provide briefings to senior administration officials and participate in the development of national social policies related to corrections, correctional health care, public health, post release services, and legislative initiatives. Member of the U.S. Senior Executive Service.

**Medical Development International**
**822 Highway A1A North, Suite 310**
**Ponte Vedra Beach, Florida 32082**

Page 15 of 21

**Vice President, Client Services**
December 1, 2003 to September 30, 2005

Medical Development International (MDI) is a medical service organization that arranges for specialty health care for inmates in federal, state, local, and private correctional facilities. Through contractual arrangements with providers and correctional facilities, MDI assembles provider networks, schedules appointments, adjudicates bills and provides fund control assistance. Major duties include participating in development of company policies and strategies, oversight of operations, and intervention on behalf of clients in contract management.

**Consultant**
**140 Parham Rd. N.W.**
**Milledgeville, Georgia 31061**
**478-968-7907**

**September 30, 2005 to Present**

Currently serve as consultant regarding prison health care with focus on Federal Bureau of Prisons. I have provided declarations, affidavits and/or testified in over 30 cases, generally during the sentencing phase, in the following Federal Judicial Districts: Central District of California, Eastern District of California, Southern District of New York, Maryland, Southern District of Florida, Colorado, Eastern District of Kentucky, District of Puerto Rico, Eastern District of Pennsylvania, Western District of Arkansas, Northern District of Ohio, and Middle District of Tennessee.

Attachment 2

## STRUCTURE OF BOP HEALTH CARE SYSTEM

Each Bureau of Prisons Health Services Unit includes health care providers. They are, the Clinical Director, staff physician, mid-level practitioners and ancillary staff such as pharmacists, radiology technicians, lab technicians.

The primary health care of the inmates is provided primarily by the mid-level practitioners (physician assistants, nurse practitioners, or unlicensed foreign medical graduates) under the supervision of a staff physician. These staff physicians are generally family practice or internal medicine specialists, and control an inmate's access to specialty medical care and review any recommendations made by medical specialists to determine whether they are within the scope of services and policy of the Bureau of Prisons before implementation.

In order for an inmate to receive care or treatment by a specialist, including physical therapy, the mid level practitioner would have to identify the inmate's medical problem and alert the staff physician who would then decide whether to refer the inmate to a specialist if one is available.

If the staff physician determines that a referral to a specialist is warranted for a non-emergency condition, such as physical therapy, that referral must be approved by the Utilization Review committee.

The Utilization Review Committee is composed of the Clinical Director, Health Services Administrator, Medical Trip Coordinator, health care providers, Director of Nursing (if applicable) and a chaplain or social worker.

These committees typically convene every two weeks to consider the non-emergency referrals. The intent of these committee reviews is to ensure that services outside the scope of those defined in policy **are not provided** and to establish an initial assessment of priority for the recommended intervention.

While there is no certainty that a utilization review committee will approve a specific recommendation for treatment, so long as the recommended intervention falls clearly within the category of "medically necessary – non-emergent", it is likely to be approved. Those that are within the category of "medically acceptable – not always necessary" are far less likely to be approved by the committee. Some institutions assign an initial priority for approved consultations/interventions using a numeric system (where 1 requires attention within one week, a priority 2 requires attention within 2-4 weeks, and a priority 3 can be delayed for a month or more), while others use a color code with similar requirements.

The Bureau of Prisons seeks to obtain medical specialty care for its inmates through contracting with local hospitals. However, contracts with hospitals do not necessarily include services of specialty physicians. In fact, each facility of the Bureau of Prisons uses a variety of procurement practices to establish agreements with both hospitals and individual physicians and other medical specialists for specialty care. The success of establishing those agreements depends on the availability of any particular medical specialist or facility in the community in which the prison is located, the willingness of that provider or facility to travel to the prison and subject him/herself to the security requirements for entrance and the constraints of treating individuals in prison, the willingness of that provider to see inmates in his office/practice/facility, and increasingly significantly, the ability of that specialty provider to obtain medical malpractice insurance when his practice includes inmates. The refusal of many malpractice insurers to cover practices that

Page 18 of 21

include inmate patients severely limits the number of specialty providers willing to treat inmates. The Bureau of Prisons does not indemnify contract medical specialists who treat inmates.

The Bureau of Prisons provides five major levels of care that define the agency's "scope of services. These levels are:

Medically Necessary – Acute or Emergent. Medical conditions that are of an immediate, acute or emergent nature, which without care would cause rapid deterioration of the inmate's health, significant irreversible loss of function, or may be life threatening.

Medically Necessary – Non-Emergent. Medical conditions that are not immediately life-threatening but which without care the inmate could not be maintained without significant risk of: serious deterioration leading to premature death; significant reduction in the possibility of repair later without present treatment; or significant pain or discomfort which impairs the inmate's participation in activities of daily living.

Medically Acceptable – Not Always Necessary. Medical conditions which are considered elective procedures, when treatment may improve the inmate's quality of life.

Limited Medical Value. Medical conditions in which treatment provides little or no medical value, are not likely to provide substantial long-term gain, or are expressly for the inmate's convenience. Procedures in this category are usually excluded from the scope of services provided to Bureau inmates.

Extraordinary. Medical interventions are deemed extraordinary if they affect the life of another individual, such as organ transplantation, or are considered investigational in nature.[3]

---

[3]    Bureau of Prisons Program Statement P6031.01, Patient Care, January 15, 2005

Page 19 of 21

Exhibit J-20:

In order for an inmate to be seen by a medical specialist such as a cardiologist or neurologist outside the facility for a non-emergency condition, an escorted trip must be approved and arranged in advance. The number of correctional officers required for each medical escorted trip ranges from one to over five, depending on the characteristics of the inmate involved. Because of staffing limitations, a facility will typically schedule a limited number of medical escorted trips each day, and generally, the number of inmates requiring such trips exceeds the number approved daily. As a result, Bureau of Prisons medical staff, generally the Clinical Director, establish priorities to determine which inmates should fill the limited number of escorted trip "slots" available. These are clinical decisions based on the Clinical Director's assessment of acuity. Thus, while an inmate may have received medical approval for specialty consultation/intervention, the delivery of that care depends heavily on the number of escorted trips available and the acuity of his condition. The likelihood that an inmate will receive regular medical escorted trips for medical specialist consultation over an extended period of time is diminished in light of these logistical variables. It is most likely that at some point his care, even if approved by the Utilization Review Committee will be interrupted as he is displaced for one of the escorted trip "slots" by inmates with more acute needs.

It is likely that the Bureau of Prisons will have access to the services of medical specialists that most inmates will require. In larger or higher security facilities, the wait for an approved outside consultation may be extensive, based on limited escort staff. In some instances, medically appropriate-non emergent appointments (specifically orthopedics) have been delayed for months, up to a year after the initial recommendation for consultation. Should such consultation occur, any intervention/treatment suggested by the medical specialist is considered a recommendation subject to the review and approval of the institution Clinical Director in compliance with the

Page 20 of 21

Exhibit J-21:

scope of services defined by agency policy and the national formulary. It is not unusual for an institution Clinical Director to decline to pursue a recommendation made by a consulting specialist, particularly if that recommendation includes intervention that is seen as medically acceptable – not always necessary or includes a non-formulary medication.

<u>Exhibit K-1:</u>

FROM: Brecht, Rachelle
TO: 05745030
SUBJECT: transcript 1
DATE: 12/14/2024 03:51:03 PM

1 in 4 inmate deaths happens in the same federal prison. Why?
SEPTEMBER 23, 20236:00 AM ET
HEARD ON ALL THINGS CONSIDERED

Meg Anderson
Ever since his release from federal prison, Jeffrey Ramirez had been waiting to die.
He passed the time at his parents' home near San Diego, doting on his mom and watching movies with his teenage daughters. But his doctors had recently told him they'd run out of options for treating his cancer.
"I can go almost about any day. I can go tomorrow. I can go a week from now, a month from now. It's all on God," he told NPR. "I try not to think about it. It hurts."
He was focused on managing his pain   and his anger.
"I'm ticked off. I'm mad," he said. "There's a lot of emotions and there's, like, what-ifs."
What if, he wondered, he could have seen a doctor right away when he first felt an inkling that something was wrong, instead of waiting more than a year for prison officials to take him to one?
"I know myself. That's the first place I would go   I'd go to the doctor. This would not happen," he said. "I'm angry because it didn't have to get this far."
Eleven days after that interview this past January, Ramirez died at age 41.
NPR looked into the deaths of people like Ramirez, who died during or shortly after their time in federal prison. Records obtained from the Bureau of Prisons (BOP) show at least 4,950 people died in its custody over roughly the past decade. Although there are more than 120 federal prisons nationwide, a quarter of those deaths occurred in a single place: the Butner Federal Correctional Complex in Butner, North Carolina. Ramirez was there in the months before his release.
More deaths at Butner are to be expected. The complex includes a federal medical center (FMC), which is essentially a prison hospital. Inmates who need intensive medical care often end up at one of these hospitals, and FMC Butner is the bureau's largest cancer treatment facility. According to NPR's analysis, more people in BOP custody died of cancer than any other cause from 2009 to 2020.
But looking closer at the experiences of individual people, NPR found numerous accounts of inmates nationwide going without needed medical care. More than a dozen waited months or even years for treatment, including inmates with obviously concerning symptoms: unexplained bleeding, a suspicious lump, intense pain. Many suffered serious consequences. Some, like Ramirez, did not survive.
Too often, sources told NPR, federal prisons fail to treat serious illnesses fast enough. When an ailment like cancer is caught, the BOP often funnels these sick inmates to a place like Butner, where it is assumed they'll receive more specialized treatment. But by the time prisoners access more advanced care, it's sometimes too late to do much more than palliative care. What's more, current and former inmates and staff at Butner told NPR the prison has issues of its own, including delays in care and staffing shortages.
The Bureau of Prisons claims to meet the same medical standards as any independent hospital, stating on its website that it is accredited by the nation's leading accreditation agency. But NPR found that, in fact, the BOP's certification lapsed two years ago.
Sources NPR interviewed say all this leads to a troubling conclusion: Federal inmates   a group with a constitutional right to health care yet without the autonomy to access it on their own   are dying more often than they should.
"Deaths in custody should be rare events, given that this is such a controlled environment," says Michele Deitch, director of the University of Texas at Austin's Prison and Jail Innovation Lab.
"Are there preventable deaths happening in the BOP? The answer to that is clearly yes."
The BOP declined NPR's request for an interview and declined to comment on individual cases, but it wrote in a statement that the bureau is "committed to providing safe, effective healthcare that is clinically appropriate" and that it "makes a proactive effort to screen and identify disease at its earliest stages."
"What took them so long to get to us?"
In addition to gathering and analyzing data from the federal government, NPR reviewed court and medical records and interviewed inmates, lawyers, families and bureau employees while looking into the stories of patients in federal prisons. Ramirez was far from the only person NPR identified who didn't get timely medical care while in federal prison.
Angela Beck, a 47-year-old at the time with a family history of breast cancer, discovered lumps in her left breast while in federal prison in Aliceville, Ala., and asked to see a doctor. After receiving imaging results "'highly suggestive' of cancer," according to an opinion issued by a federal judge, she waited more than eight months for a biopsy, which confirmed the cancer. Another two months passed before she got surgery, during which doctors confirmed the disease had spread to her lymph nodes. Beck then waited another five months before she saw an oncologist. By that time, it was too late to start chemotherapy

or radiation. A federal judge granted her release in June 2019.

Michael Derentz, a 70-year-old inmate at the Fort Dix federal prison in New Jersey, was granted compassionate release in 2022 after a federal judge found the BOP's repeated delays in care "disturbing." "Delays in securing urgently needed follow-up appointments contributed to Derentz becoming blind in his left eye," the judge wrote.

Joseph Guadagnoli died of cancer while in custody at the federal prison in McDowell County, W.Va., in July 2022, after complaining of a litany of ailments. By the time doctors diagnosed his cancer in May of that year, it was too late for treatment, his brother Michael Guadagnoli said. On Sept. 7, 2020, records show, Joseph wrote a sick call request to staff: "My conditions are getting worse. I need to be seen soon." On Oct. 10: "This is taking a psychological toll on me   what do I have to do to be seen   to get attention?" On Dec. 1: "I cannot breathe. ... I have been asking for seven months."

In April 2020, Turhan Law began having nosebleeds several times a day at the federal prison in Loretto, Pennsylvania. According to a compassionate release motion filed by his lawyer, that bleeding continued for months before prison officials took him to a hospital. In the summer of 2020, a biopsy confirmed squamous cell carcinoma, a type of cancer. But by the time Law arrived at Butner in November of that year, no treatment plan had been started, according to a supplemental motion filed in support of Law's release request. In December 2020, a month after the BOP sent Law to Butner, a federal judge granted his request for release, citing in part the delays in care Law experienced.

Michael Boughner, a federal prisoner at the U.S. penitentiary in Florence, Colo., complained of horrible headaches for at least five weeks before he saw a doctor, his mother, Linda Renta, said. "He fainted four or five times, and the guards were convinced he was faking it," Renta said. "They found that he had a tumor in his brain the size of an egg." The BOP sent Boughner to Butner, where he lived for about five months before, prison records show, he died of cancer at age 50 in March 2019.

Like Ramirez, Boughner and Law were transferred to Butner for cancer treatment. A current medical staff member at Butner who requested that her name not be used for fear of retaliation said she has heard stories like theirs "so many times."

"So many inmates have told me, 'I complained about this lump, or I complained about this pain for so long, and they only gave me cream, they only gave me Motrin, they never sent me out for tests or anything. Now they send me here and I have Stage 3 or Stage 4 cancer,'" she said. "Our question is always: What took them so long to get to us, and why did they send them to us when there's nothing that we can do?"

The staff member told NPR that she has seen many patients for whom nothing could be offered beyond palliative care. "What is shocking and frustrating is when a patient has an issue where death could have been prevented had they received the medical care in a timely manner," she added.

What type of punishment are we really wanting to dole out on people? Because none of these people had death sentences.
Elizabeth Blackwood, National Association of Criminal Defense Lawyers

Art Beeler, a former Butner warden, said it was hard for him and his staff to see inmates arrive at the prison with late-stage cancer.

"It did not happen every day or even every week, but there were cases we received late, and every one of them were frustrating," Beeler told NPR. "If we received someone who had Stage 4 prostate cancer, who showed indicators early on in the process, we were very frustrated. ... We knew more than likely the patient would live if they had received treatment early on."

Elizabeth Blackwood, counsel and director for the First Step Act Resource Center at the National Association of Criminal Defense Lawyers, says whether a person in custody can get the medical care they need should be considered at sentencing, before they ever set foot in a prison..

"What type of punishment are we really wanting to dole out on people? Because none of these people had death sentences," she said. "None of these people were sentenced to excruciating pain and torture while they aren't getting the medical treatment and not getting relief from their painful cancer, but yet that's being inflicted on them every day on a regular basis."

"It just fell through the cracks"

Jeffrey Ramirez estimated he first felt the smallest trace of a lump in his left testicle in the summer of 2020.

"I remember when I was younger, I was told once you get to a certain age, you should check yourself. And so that's exactly what I did," Ramirez said. He was 39 at the time and had been sentenced to 10 years in prison in January of that year for intent to distribute methamphetamine and a related weapons charge.

The lump was about the size of a BB, not even a quarter of an inch in diameter, he said.

"I put in a medical slip, and they didn't really pay much attention," he said. "I didn't really push it because I didn't think it was anything serious."

By early 2021, he had been transferred to the federal prison in Phoenix to serve out his time. At that point, his testicle had grown considerably. He filled out an "Inmate Request to Staff" form, sometimes called a cop-out.

"I've been putting in multiple cop-outs about my medical problem and I haven't been seen," Ramirez wrote to the prison's health services staff on Jan. 19, 2021. "My left testicle is becoming unbearable. I need help, please help me."

When a medical staff member saw him a week later, the staff member noted a possible hernia and ordered an ultrasound. On Feb. 2, he was seen again. This time, a nurse practitioner ruled out a hernia but observed that the left testicle was "much larger" than the right one and firm to the touch, according to prison medical records obtained by NPR. The nurse practitioner scheduled an ultrasound for about two weeks later and listed the priority as "urgent."

But nearly four months went by   and no ultrasound. On May 23, Ramirez wrote to staff again: "I'm requesting medical attention

Exhibit K-3:

for my left testicle. This has been an ongoing issue and haven't received any further medical attention. My testicle has grown more in size and I have pain shooting through my testicle to the left side of my stomach and even my lower left back."

Two days later, a nurse wrote back: "You have an ultrasound pending."

Ramirez wrote again about a week later and was told again that an ultrasound was being scheduled and to take ibuprofen and Tylenol. All of June went by. Then all of July. He was seen on Aug. 3, and another ultrasound, labeled again as urgent, was scheduled, this time for September. But that ultrasound never came either.

"It was like getting kicked in the groin that whole time. I got to the point where it was really uncomfortable. I couldn't even sit down," Ramirez told NPR. "When I asked the assistant warden, she told me to 'trust the process.'"

By the time Ramirez saw a specialist out in the community, it was January 2022 more than a year after he first started complaining.

"While I was there, they did the ultrasound and whatnot, and they're like, 'OK, you can go,'" Ramirez recalled. "So I'm on the way out and all of a sudden I see three nurses running out towards us like, 'Uh, you're not going anywhere. You need to be admitted.' And that's when I found out that I had cancer."

Doctors diagnosed him with Stage 3C testicular cancer, the final stage of the disease. By then, it had spread to his brain and lungs.

Exhibit K-4:

---

FROM: Brecht, Rachelle
TO: 05745030
SUBJECT: transcript 2
DATE: 12/14/2024 03:51:03 PM

Two months later, in March 2022, Ramirez started a first round of chemotherapy and had surgery to remove his left testicle.
About two weeks after that, prison officials transferred him to Butner.
When I asked the assistant warden, she told me to 'trust the process.'
Jeffrey Ramirez, a former federal inmate who died of cancer shortly after being granted compassionate release
Early detection is especially important in treating testicular cancer. If the disease is caught early, the cure rate is as high as 98%. But a delay in diagnosis of more than six months is an independent predictor of a lower chance of survival, says Dr. David Vaughn, a genitourinary oncology professor at the University of Pennsylvania.
Vaughn did not treat or diagnose Ramirez, but he stressed that any patient with a firm, enlarged testicle   like what Ramirez had should get an ultrasound as soon as possible.
"Honestly, if someone comes into our emergency room with this complaint, they get an ultrasound while they're in the emergency room. If someone's going to see their primary care doctor, one would expect that the ultrasound would be done within a few days," Vaughn said.. "That's the standard. That's what happens every day in America."
Yet that's not even close to what Ramirez experienced.
"It just fell through the cracks," says Zandra Lopez, a federal public defender who represented Ramirez. "Jeff's case was obvious, but we've seen it in a lot of our cases. It seems to be something systemic that's happening in all of the BOP prisons."
"When our clients are requesting help, the internal medical staff recognize that these people need to go out to a specialist," she added. "But it goes in this hole. And I don't understand why they're not being seen. And by the time they do, it's oftentimes too late."
There's evidence to back that up. Several studies suggest the risk of dying from cancer may be higher behind bars and in the time shortly after inmates are released.
"I don't want to be one of those statistics"
When Bernie Madoff, who orchestrated the largest Ponzi scheme in U.S. history, was sent to Butner in 2009, a prominent criminal defense attorney said Madoff "hit the inmate lottery" by landing in what he called the "crown jewel" of the federal prison system. But the stories of patients at Butner suggest inmates don't always receive the better care that might have been expected there.
In January 2009, doctors at Butner noted a lesion on inmate Greg Baker's penis during a surgery for a narrowing of his urethra. At the time, a pathology report indicated the lesion's cells were abnormal and should be watched. During the next few months, doctors evaluated Baker frequently, but the lesion wasn't biopsied until July, when he was diagnosed with a rare form of cancer. In September, doctors partly removed Baker's penis. He sued the BOP after his release, but a federal judge ruled in the government's favor, saying Baker had not shown that the outcome would have been any different had he gotten care earlier.
"Greg went into prison a healthy man," Jay Hurst, Baker's trial lawyer, said. "He came out unable to work. A complete disabled person."
Butner inmates sometimes receive medical care at hospitals out in the community, like the nearby Duke University Medical Center.. In July 2013, a doctor at Duke "strongly recommended" that Butner inmate Michael Krembel have surgery to treat his squamous cell carcinoma "as soon as possible," according to medical records filed as exhibits in court. But that didn't happen, and by December of that year, the surgery was no longer feasible.
"That delay, in my opinion, was critical, not up to any standard of care under the circumstances, and certainly not in the best interests of the patient," John Carr, a dermatologist who worked at Duke, wrote in a consultant report filed in court. "Because of the delay, the medical records reflect that Krembel has had to undergo more extensive, dangerous, life-threatening, painful and disfiguring series of procedures than otherwise would have been necessary."
Krembel later filed a lawsuit but died while appealing the case. The appeal was dismissed in 2020.
In May 2017, Tamarquis Ashanti Phillips, 38, died after being transferred from a jail in Mecklenburg County, N.C., to Butner. Phillips took three anti-epileptic medications twice daily. According to a lawsuit filed by his family,
he had not experienced a seizure in more than a year at the time of his incarceration. Phillips arrived at Butner on May 16 of that year.
Although the lawsuit states he requested his medications multiple times, Phillips' prison medical record showed no indication that he received any medications while at Butner.
On May 20, four days after he arrived, he was discovered "face down, unresponsive, pulseless, and cold, with locked muscles and blood on his pillow," the lawsuit says. Prison records obtained by NPR list his cause of death as epilepsy. Though the government has denied any wrongdoing, the lawsuit was settled this year, according to the family's lawyers.
Frank Carr, an inmate at Butner, waited almost two years for a heart surgery to repair a narrow aortic valve, which prosecutors acknowledged he needed at his sentencing in December 2020. Though Carr refused the surgery at least twice while in custody, records obtained by NPR show he emailed prison staff in August 2021 to let them know he wanted the procedure done.
"The last visit we had in July you told me to let you know when I'm ready to have the surgery," Carr wrote in all caps on Aug. 14,

Exhibit K-5:

---

2021. "I'm officially notifying you to let you know I'm ready to have the surgery because I don't want to die in prison.." More than a year later, he still had not had the surgery. In a September 2022 memorandum to the court, Carr's lawyer, Trent LaLima, calculated how long Carr had been waiting.

"It has been 639 days since this court's recommendation to the Bureau of Prisons that Mr. Carr receive surgery as soon as possible. It has been 582 days since Mr. Carr's first motion for compassionate release on this basis. 474 days since he experienced a heart attack," LaLima wrote. "In all that time no surgery has occurred."

Around the same time, Carr told NPR he worried he might die waiting for the surgery.

"I see so many people die in here. I witnessed people die. I witnessed it. And I don't want to be one of those statistics," he said during a phone call from prison. "I should still get the fair medical standard of anybody that's not incarcerated.. I'm a father. I'm a brother. I'm a son. And this could be your family member. This could be your son, your father, your husband in here."

Carr got his long-awaited surgery in November 2022 and has since been transferred to the Fort Dix federal prison in New Jersey.

"Death is becoming the price paid"

In March 2022, the Department of Justice's Office of the Inspector General audited the BOP's contract with the University of Massachusetts Chan Medical School, which provides some of the medical services at Butner. The report found the BOP "did not have a reliable, consistent process in place to evaluate timeliness or quality of inmate healthcare."

The report also noted "challenges in transporting inmates to off-site appointments which resulted in a frequent need to reschedule appointments that could delay an inmate's healthcare.." UMass officials told auditors that their staff spent a "significant amount of time" canceling and rescheduling inmate appointments, according to the report.

"We believe it is difficult for the BOP to determine whether inmates are receiving care within the required community standard," the report noted.

A UMass Chan Medical School spokesperson declined NPR's request for an interview. "We defer to BOP," the spokesperson said, noting that the clinical director at Butner has medical control and is a federal employee. The university does not determine what care is provided, and delays in care due to Butner's staffing were outside its scope, the spokesperson added.

Delshon Harding, president of the AFGE-CPL 33 Local 408 union and a correctional officer at Butner, said he believes staff shortages are the primary reason inmates go without essential care.

"With the cuts to the staffing, we can't provide the security that is needed, we can't provide the medical treatment that is needed and the safety that's needed to fulfill the mission," Harding said.

In fact, union officials told NPR that out of roughly 200 nurse and paramedic positions listed for the prison complex, more than 20% are currently vacant, a fact the bureau confirmed to NPR.

Harding said the medical center used to have five nurses on each unit, for instance. Now, it has only three nurses on each, and in the past, it has been as low as two.

"You're talking about anywhere up to 30 inmate-patients being required to be assessed and properly receive adequate medical care from two nurses," Harding said. "We have a lot of concerns and complaints from the nurses about being burned out."

When medical emergencies happen at night, the potential outcome can be deadly. Danielle Garner, vice president of the union and a correctional officer at Butner, told NPR that while Butner's federal medical center does have medical coverage on-site from 9 p.m. until 5 a.m., the other three prisons and prison camp within the Butner Federal Correctional Complex do not. That's allowed under BOP policy, as long as a plan for emergency transportation to another facility is in place and staff certified in CPR are available. But Garner alerted NPR to two deaths last fall. Both occurred at night, when medical care was not immediately available.

"Staffing shortages and unsafe practices can no longer be accepted nor excused. Death is becoming the price paid for doing more with less at FCC Butner," Garner wrote in a letter to the bureau's mid-Atlantic regional director.

In October 2022, an inmate fell and bumped his head during the night, according to Garner's letter. "Immediate patient care was not available. The inmate was later taken to the outside hospital and the inmate passed away," Garner wrote, referring to a non-prison hospital out in the surrounding community.

Then, in November, another inmate was unable to get timely medical care during the night after staff had to escort a different inmate to the hospital. The inmate who did not get immediate care later died, according to the letter.

"The quality of care proves to be deadly," Garner wrote. "It is reasonable to believe that some of these medical complaints/conditions could have been prevented resulting in life being saved if adequate medical staff was available."

In a statement, a bureau spokesperson said that the BOP has issued guidance to all employees detailing specific procedures for after-hours emergencies and that all employees are trained in responding to emergencies.

"The U.S. is experiencing a national shortage of healthcare providers, exacerbated by the exhaustion and burnout attributed to the COVID-19 pandemic. The [BOP] is not immune to these trends and is working diligently on recruitment and retention efforts to ensure that facilities are appropriately staffed," the spokesperson wrote.

"All of that creates this predictable outcome"

Across the federal prison system, staffing shortages have been documented for decades.

Nearly 30 years ago, in 1994, a report from the Government Accountability Office determined that inmates with special needs including women, psychiatric patients and patients with chronic illnesses were not receiving needed medical services due to staffing shortages. The report focused in part on Butner.

Exhibit K-6:

More than 20 years ago, in 2000, the Government Accountability Office documented increasing numbers of chronically ill inmates being sent to medical referral centers like the FMCs because they couldn't be treated appropriately at their own prison. "For these inmates, the medical referral center is the end of the line," the report said. "This means that fewer and fewer hospital beds are turning over. It also means that new patients from standard prisons may have to wait for the next available medical referral center hospital bed to be freed up."

In 2015, the Justice Department's Office of the Inspector General (OIG) found that "limited institution staff and inadequate staff training" affected the prison system's ability to care for inmates, especially as they age. At one prison, the OIG found that inmates had to wait, on average, nearly four months to see a specialist for cardiology, urology, neurosurgery and pulmonology.

Exhibit K-7:

FROM: Brecht, Rachelle
TO: 05745030
SUBJECT: transcript 3
DATE: 12/14/2024 04:21:03 PM

In 2016, the Justice Department's OIG reported that medical staff positions throughout the system were only 83% filled, even though BOP policy says the vacancy rate shouldn't be more than 10% during an 18-month time frame. The report found that 3 out of every 4 federal prisons had a vacancy rate higher than that.

And according to a report this month from the Pandemic Response Accountability Committee, more than two-thirds of BOP facilities experienced a nursing shortage during the COVID-19 pandemic.

Todd Bussert, a federal criminal defense lawyer who has worked on prison issues for two decades, says that staffing matters because an inmate who needs to be seen by a provider or specialist out in the surrounding community, for example, requires more resources.

"What that entails is putting the prisoner in a transport vehicle, taking them into the community, bringing them into a hospital, with staff going along and being pulled away from their other responsibilities," Bussert said. "So that is generally a pretty heavy lift just to get that level of attention."

This means that when inmates have potentially long-lasting, serious and complex conditions, prisons may opt to transfer them to higher-level care facilities within the federal prison system, rather than continuously taking them out into the community, Bussert said.

"The institution's not going to say, 'Let's start you on a course of care with a local oncologist or go to the hospital here,' because the costs will be astronomical for them. They'll say, 'Let's send you to our facility that focuses on that,' which would be Butner," he said.

Lack of staffing can also have a direct impact on the quality of care itself. Finding cancer early or keeping a chronic health problem from becoming severe requires regular contact between patients and health providers, says Homer Venters, a physician who works as a court-appointed monitor of health care in jails and prisons.

"Without enough staff to do that, it's absolutely inevitable that people's symptoms will worsen, their illness will worsen," Venters says. "All of that creates this predictable outcome. People then come to the attention of health staff much closer to death, much more into an acute emergency than what needed to have happened."

"We can't answer fundamental questions"

On the face of it, the question of why so many people die at Butner seems simple to answer: The sickest of the sick get sent there, and those are the people more likely to die in the first place. The challenge, according to Venters, is determining which deaths are "jail attributable."

Venters, who was the chief medical officer of New York City's jails, says after a death in custody, prison officials should ask two questions: Did the inmate receive the appropriate standard of care, and did anything happen behind bars that significantly contributed to the death?

"That is something that should happen. It would happen if you were in a nursing home and died. It would happen if you're at a hospital," Venters says. But it is something, he added, that the BOP does not consistently do..

"And they're not alone," he said. "Most prisons and jails want nothing to do with that kind of accountability."

Because the federal prison system is not under the oversight of health authorities like the Department of Health and Human Services or the Centers for Disease Control and Prevention, Venters says the bureau sometimes comes up with "soft and exculpatory" reviews when an inmate dies.

NPR requested the mortality reviews of each person who died in the BOP's custody since 2009 but has yet to receive them from the bureau.

"My question is: Why do we have one of the nation's biggest health services not really being overseen by anybody outside of them?" Venters added.

Despite being the largest incarcerator in the world, the U.S. has very little independent oversight of its state and federal prison systems, says Deitch, of the University of Texas at Austin's Prison and Jail Innovation Lab.

"There are so many things that we don't know about our prisons, things that you would just assume we would know," she said. "How dangerous are they? How much violence is there? How well does the health care system work? We can't answer fundamental questions."

On a federal level, the courts, the Justice Department's OIG and the Government Accountability Office each provide a mechanism for accountability, but they're more reactive than proactive, says Deitch. In Congress, Sen. Jon Ossoff, D-Ga., along with Sen. Dick Durbin, D-Ill., and Sen. Mike Braun, R-Ind., introduced a bill last fall called the Federal Prison Oversight Act, which would require the OIG to conduct inspections of prisons and establish an ombudsman in the Justice Department.

Sen. Jon Ossoff, D-Ga., (left); Sen. Dick Durbin, D-Ill.; and Sen. Mike Braun, R-Ind.., introduced the Federal Prison Oversight Act, which would require the Justice Department's Office of the Inspector General to conduct inspections of prisons and establish an ombudsman in the department.

Kevin Dietsch/Erin Scott/pool and Anna Moneymaker/Getty Images

Another potential layer of oversight could be accreditation. The bureau's federal medical centers used to be accredited by the

Exhibit K-8:

Joint Commission, which accredits 80% of U.S. hospitals.

At the time of this story's publication, the BOP still publicly lists the Joint Commission on its website as the accrediting agent for its FMCs, but they are no longer accredited by the Joint Commission. The commission told NPR that the bureau's accreditation with it expired two years ago, in September 2021. When NPR reached out to the BOP with this information, the bureau responded that it is soliciting new accreditors and that the FMCs are continuing to observe commission standards.

"No healthcare system is perfect, but the BOP makes a concerted effort to identify trends and improve operations based on changes in community practice and lessons learned from previous experience," a bureau spokesperson told NPR. "Our commitment remains to provide quality medical care and a safe environment to all individuals in our care and custody."

When any facility in the community is no longer accredited, it has "real consequences," says Dr. Jody Rich, a professor of medicine and epidemiology at Brown University. But, he added, because of the lack of oversight at federal prison facilities, it's difficult to assess the significance of the bureau discontinuing its Joint Commission accreditation.

"Nobody can tell you if it matters," Rich said.

Rich said the quality of health care varies widely from prison to prison.

"There are some really outstanding physicians, nurse practitioners, nurses and technicians that really care and really work very hard," Rich said. "But at the same time, is correctional health care good or bad? I have no idea. Nobody has any idea. Because there's no oversight."

"He just wanted to be with his family"

Once the BOP sent Jeffrey Ramirez to Butner, he continued cancer treatment there.

"Jeff told me it was really tough and he just wanted to be with his family. He knew he was going to die," Zandra Lopez, the lawyer who represented him, said.

FROM: Brecht, Rachelle
TO: 05745030
SUBJECT: transcript 4
DATE: 12/14/2024 04:21:03 PM

Lopez prepared his motion for compassionate release.
"The medical records were just crying out that this man had been suffering for so long and that he needed to go home," she said. "We filed it, and it was granted within a matter of days."
His family waited for him at the airport in San Diego in August 2022.
"When he came out, it hit me that this is reality," Evette Ramirez, his 20-year-old daughter, said. "But he came to us with the biggest smile on his face. And he just embraced all of us, and it was the best feeling."
Ramirez spent much of his final months with Evette and his 18-year-old daughter, Yelena Ramirez, who were also living at his parents' house in Vista, California. They'd go to the beach or the 7-Eleven down the street. They had movie nights and saw the latest Avatar movie.
"Little things like that, because he didn't have energy to be going to places and walking around," Evette said. "We still made the most of it."
Evette was with her father when he died on Jan. 16, 2023.
"It was 6:43 a.m., and I was right there," she said. "That's what gives me the most peace that I was there, holding his hand in the hospital room."
n the days after Ramirez's death, his daughters and parents, Teodoro and Margarita Ramirez, put up an altar for him in their living room. People left flowers, and Evette would sometimes come there to talk to him.
But she says it didn't have to be that way: "I definitely think if he had gotten medical attention when he asked for it, I probably would have gotten to spend more time with my dad."

---

Editor's note: Some of Jeffrey Ramirez's and Joseph Guadagnoli's written accounts contain minor grammatical errors, which NPR corrected for clarity.
This story was edited by Robert Little and copy edited by Preeti Aroon. It was produced for radio by Graham Smith. Barbara Van Woerkom and Tirzah Christopher contributed research, and Nick McMillan provided data analysis. Photo editing by Emily Bogle.

<u>Exhibit L-1:</u>

NC prison afflicted by mold, flooding and electrical hazards, but repairs are far off
Raleigh News and Observer
Avi Bajpai
December 29, 2022 at 4:00 AM
In May 2020, officials at the Butner federal prison complex north of Durham drew up an estimate for the cost of roof repairs at FCI Butner II, one of the complex's medium-security prisons.

Water had been seeping through the roof in multiple areas, including the commissary and laundry, and continued to leak for several months. By early 2021, roof leaks, some of them described as "severe" by the prison's environmental and safety compliance department, were being reported throughout the prison. And then earlier this year, employees working at FCI II started to notice what looked like mold   dark-colored, fuzzy spots on the ceilings   growing near areas with water damage.

The union that represents many of FCI II's employees   around 200 in total   has been pressing prison officials to make necessary repairs to ensure the prison is a safe working environment. But documents obtained by The News & Observer including requests for funding, monthly inspection reports, and correspondence between the union and prison officials, show that more than two-and-half years after the initial estimate was generated, conditions have continued to worsen, and no repair work has taken place.

And now, nearly a year after federal officials allocated money to replace a portion of the roof, the union's patience is running out.

After the union filed a complaint about the leaks and mold growth with the U.S. Occupational Safety and Health Administration in late November, prison officials were given a week to look into the allegations of unsafe working conditions and remedy any that existed. The prison initially asked for an extension of a week or so to make repairs, before requesting an additional six-month extension.
For union leaders and members who have been waiting for repairs to begin since January 2022, that was unacceptable.

"The Agency has acknowledged that the deteriorating conditions have (worsened) significantly over the past two years," wrote Delshon Harding, president of AFGE Local 408, in a letter Dec. 22 to OSHA officials who are considering the request for an extension until June 2023.

"Yet, OSHA grants the Agency a second extension to gamble (6) six more months with the lives of Federal Law Enforcement officers and individuals affected. One thing that cannot be denied, Management Officials at FCC Butner are knowingly and (willingly) refusing to lower these hazards that can cause or are likely to cause death or serious physical harm."

If OSHA approves the prison's request, Harding wrote, the union is prepared to try every available option to get its concerns addressed, including potentially filing a complaint with the Federal Labor Relations Authority, requesting a congressional investigation, or pursuing legal action.

In an email prior to the union's letter to OSHA, Eric Lucero, a spokesperson for the U.S. Department of Labor, told The N&O that OSHA officials were unable to comment since their investigation is ongoing.
'Significant amount' of water leaking from roof
Harding has served as president of the local American Federation of Government Employees union since January 2021, but has been a member of the union since 2003. Roof issues at FCI II and FCI I, another medium-security prison in the complex, date back nearly a decade, according to Harding.

At FCI II, as the leaks got worse, prison officials started removing ceiling tiles that had become saturated with water. In their response to OSHA officials in December, prison officials said the tiles that had been removed were not being replaced.

Exhibit L-2:

According to Harding, that has only made the problem worse.

"We were finding that every time it rains, there was a significant amount of rain water that was leaking in from the roof, into the ceiling, onto tables, work areas, staff offices, documents, equipment, even down to the food service department where the meals are prepared," Harding said..

In some cases, the union reported in its complaint to OSHA, rain water leaking into the building caused flooding as well.

Prison officials acknowledged that water can accumulate in certain parts of the building, like the education department. In those situations, "inmate orderly crews are sent to those areas to mop up any accumulated water and to place water attainment devices, such as buckets, in the area to ensure that water does not accumulate," Warden Lynne B. Kelly reported to OSHA officials.

A separate issue emerged when employees began reporting that water dripping through the roof was pooling inside light fixtures.

In the prison's request for an additional six-month extension, Kelly wrote that the prison was taking multiple steps to ensure the safety of employees, including putting up cautionary signs near fixtures that should be avoided, and shutting off any electrical components where water was found.

"When water impacts electrical components, such as lights, work orders are promptly submitted to disconnect power to that specific electric component and that power remains disconnected until the roof leak impacting the area is completely resolved," Kelly wrote. "When roof leaks cause the saturation of building materials, such as ceilings or walls, the (affected) materials are removed and the area is sanitized to inhibit the growth of mold."

A year later, no repairs have begun

The ongoing roof leak problems date back to at least May 2020, when prison officials estimated the cost of at least some needed repairs at $1.6 million. It was not clear from records how extensive those repairs would have been. In January 2022, more than a year-and-a-half later, the Federal Bureau of Prisons, the agency in charge of Butner and other federal prisons, notified Butner officials that they would receive $500,000 to replace the roof above the commissary and laundry.

But a little more than a month later, prison officials went back to the BOP to report that conditions had significantly worsened. It wasn't just one or two departments of the prison that needed a new roof; now, it was the entire prison's roof system that had to be replaced.

And $500,000 wasn't going to cut it. Now, the request from Butner officials was for $7.49 million.

In a Feb. 25 letter to BOP officials, Warden R. Ramos wrote that the prison's roof had seriously deteriorated, and was allowing "large quantities" of water to pour into the building. In addition to ceiling damage, the leaks had damaged insulation and some equipment as well. Ramos also noted there were concerns of mold growing from moisture.

The leaks may have been contained to certain parts of the building earlier, but they were widespread now. The areas of the prison experiencing leaks, according to Ramos, now included: "Health Services, AW Complex, Visitation, Education, Recreation, Religious Services, Psychology, Vo-Tech, UNICOR, Facilities, FCI 2 Powerhouse and Food Service."

"The roof system has high amounts of moisture trapped in the insulation boards. This water infiltration should be considered a complete failure of the roofing system for the FCI 2," Ramos wrote.

Ramos also told BOP officials that the roof damage had reached the point where there were "no maintenance or temporary repairs that can be made to stop the leaks due to the roof membrane deterioration." Those repairs had already been tried, he said, and had failed since the new materials wouldn't bind to the water-soaked membrane.

In an email, Scott Taylor, a BOP spokesperson, said BOP and Butner officials take seriously their duty "to protect the individuals entrusted in our custody as well as maintain the safety of correctional staff and the community, as this remains one of the highest priorities for the BOP."

Since January 2022, an additional $1.4 million  for a total of $1.9 million  has been allocated to FCI II for roof repairs, Taylor said.

Taylor said prison officials recently awarded the $1.9 million in total funds to a roofing contractor to begin replacing the roof over the food service department, as well as the commissary and laundry. But work isn't expected to start until the spring, Taylor

Exhibit L-3.:

said, when the weather is suitable.

**Prison refuses to conduct mold test**
In its complaint to OSHA, the union also reported that there were ceiling tiles in the food service department with visible mold growth.

But even though the mold was visible to employees, and prison officials later had areas with possible mold growth treated with chemical sprays, officials hesitated to grant the union's request for an air quality and mold test to be conducted, to confirm the presence of mold and any airborne toxins.

In August, the union asked two different wardens to conduct the test. Both of those requests were denied. Months later, in late November, prison officials agreed to do a test, but in FCI I. That test showed the presence of mold. The union's request for FCI II to be checked for mold continued to be denied.

In their response to OSHA, prison officials said they did not find any "mold affected ceiling tiles" in the food service department. Asked why officials have declined to conduct a test in FCI II, despite multiple requests from the union since August, Taylor said the prison "has determined an air quality test is not indicated at this time."

**What happens now?**
The next step in this case is for OSHA to determine if it will grant the six-month extension to prison officials, giving them until June to repair roof leaks and prevent water from collecting inside electrical panels or light fixtures. According to Taylor, OSHA gave the union 10 days to review the prison's request for an extension, which he said was submitted on Dec. 21.

Harding provided OSHA with the union's response the day after it was notified of the request.

If the extension is granted, Harding said the union is ready to pursue multiple options to try to expedite the process and allow repairs to begin quickly.

"The last thing we want is to be silent on this issue," Harding said.

For more North Carolina government and politics news, subscribe to the Under the Dome politics newsletter from The News & Observer and the NC Insider and follow our weekly Under the Dome podcast at campsite.bio/underthedome or wherever you get your podcasts.

**Exhibit M-1:**



U.S. Department of Justice

Federal Bureau of Prisons

Federal Detention Center

Office of Health Services

SeaTac, Washington 98198

June 22, 2023

## RESPONSE TO REQUEST FOR INFORMAL RESOLUTION

FROM: K. Posalski, AHSA

SUBJECT: BP-8 Response

I am writing this in response to a request for Informal Resolution from inmate GRIFFIN, RONNIE DOYLE Reg. No. 50113-086. You have requested management of a dislocated shoulder occurring on April 01, 2023. There is no documentation on record of such an injury, nor has there been any mention of it on any of your encounters with medical since. You have already been scheduled for a sick call for similar complaints as well as for a chronic care clinic. Please watch for a call-out and follow up with this complaint then.

Exhibit M-2:

DB-6L

Attachment A

INFORMAL RESOLUTION FORM

INFORMAL RESOLUTION INSTRUCTIONS: STAFF MUST COMPLETE AND ATTACH THE ORIGINAL OF THIS FORM TO EACH BP-DIR-229, WHEN THE COMPLAINT CANNOT BE INFORMALLY RESOLVED. THE BP-DIR-229 WILL NOT BE ACCEPTED WITHOUT THIS COMPLETED FORM, EXCEPT THOSE APPEALING UDC ACTIONS. INFORMAL RESOLUTION FORMS MUST NEVER BE GIVEN TO THE INMATE TO COMPLETE.

NAME: Ron Griffin                          REG. NO.: 50113-086

UNIT: DB

DATE BP-9 REQUESTED: 06-27-23

DATE BP-9 ISSUED: 6-27-23

DATE BP-9 RETURNED:

INMATE'S COMPLAINT: Dislocated and relocated shoulder on 4/1/23 causing pinched nerves and loss of use of right hand and lower arm. Extreme pain. Have been ignored by Health Services.

RELIEF REQUESTED: Adequate medical care and further assessment for right shoulder/arm/hand; restored use.

ACTION(S) TAKEN TO INFORMALLY RESOLVE COMPLAINT:         SEE ATTACHMENT

NOT RESOLVED BY MEDICAL

WAS THE INFORMAL RESOLUTION ATTEMPT SUCCESSFUL?

YES            (NO)

CORRECTIONAL COUNSELOR: Smur                    DATE 6-27-23

UNIT MANAGER:                                   DATE 6/23/23

TRULINCS 50113086 - GRIFFIN, RONNIE DOYLE - Unit: SET-D-B

----------------------------------------------------------------------------------------------------

FROM: 50113086
TO: Health Services
SUBJECT: ***Request to Staff*** GRIFFIN, RONNIE, Reg# 50113086, SET-D-B
DATE: 04/23/2023 05:10:26 PM

To: medical
Inmate Work Assignment: none

im having issues with my shoulder being dislocated, wich is now begining to effect my entire hand and lower region of my arm.
they are both numb. can i please be put on a call out now to have this addressed

Exhibit M-4:

## TRULINCS 50113086 - GRIFFIN, RONNIE DOYLE - Unit: SET-D-B

--------------------------------------------------------------------------------------------------

FROM: Warden
TO: 50113086
SUBJECT: RE:***Inmate to Staff Message***
DATE: 05/08/2023 01:22:02 PM

This is in response to your Inmate Request to Staff regarding Health Services.

Communication has been made with the Acting Health Services Administrator in order to address your concern accordingly.

From: ~^! GRIFFIN, ~^!RONNIE DOYLE <50113086@inmatemessage.com>
Sent: Sunday, May 7, 2023 7:08 PM
Subject: ***Request to Staff*** GRIFFIN, RONNIE, Reg# 50113086, SET-D-B

To: madical issues
Inmate Work Assignment: n/a

I have been contacting medical about several chronic issues that I've been dealing with and its gotten me nowhere, I was informed I needed to adress these issues with you before taking it to the next level. The issues that im talking about are a dislocated shoulder that has gone out of socket 5 times. The main issue my heart function is less then 15% I need this addressed asap

Exhibit M-5:

## TRULINCS 50113086 - GRIFFIN, RONNIE DOYLE - Unit: SET-D-B

-----------------------------------------------------------------------------------------

FROM: Warden
TO: 50113086
SUBJECT: RE:***Inmate to Staff Message***
DATE: 06/20/2023 11:32:03 AM

This is in response to your Inmate Request to Staff regarding the Administrative Remedy process.

Communication has been made with your Unit Manager in order to address your concern accordingly.

From: ~^I GRIFFIN, ~^IRONNIE DOYLE <50113086@inmatemessage.com>
Sent: Tuesday, June 13, 2023 5:39 PM
Subject: ***Request to Staff*** GRIFFIN, RONNIE, Reg# 50113086, SET-D-B

To:
Inmate Work Assignment: N/A

Hello,

Today, counselor Smith told me that my BP-8 forms that I had submitted were no where to be found. He said that he "went to medical, and they weren't there. [He] checked his inbox and they weren't there. They disappeared." And he said that he's "not going to run all over this building looking for those."

I had filed these BP-8s on May 31. Now these forms are apparently lost and the counselor is unwilling to look for them. This is not a working administrative remedy program.

Pursuant to program statement 1330.18, informal resolutions are suppose to happen in an orderly and timely fashion. I am supposed to meet the deadline of filing a BP-9 within 20 days of first grieving. How am I supposed to do that if I can even get an informal resolution filed and returned at all?

Please help. As Warden, pursuant to 1330.18, you can waive the requirement for a BP-8 and allow me to proceed to a BP-9. This is warranted given the delay so far and my issues. I have serious medical needs including an abdominal aortic aneurism, severe diabetic complications including an open ulcer on the bottom of my foot, a recently dislocated shoulder, and also a broken rib (due to a fall I had last night).

The BP-8 process with Mr. Smith has been a runaround. Please consider waiving the informal resolution requirement, or, at least help so that I can file a BP-8 in an orderly and timely fashion.

Thank you.

## TRULINCS 50113086 - GRIFFIN, RONNIE DOYLE - Unit: SET-D-B

--------------------------------------------------------------------------------------------

FROM: 50113086
TO: Health Services
SUBJECT: ***Request to Staff*** GRIFFIN, RONNIE, Reg# 50113086, SET-D-B
DATE: 08/11/2023 07:44:05 AM

To: Dr. Dy
Inmate Work Assignment: n/a

Hello,

I need to be seen for my shoulder, arm, and hand. I gave a written urgent sick-call request to Pederson yesterday morning. I have completely lost use of my right hand from a pinched nerve from my dislocated shoulder. I fear that I might suffer permanent loss of use of my right hand. My forearm has lost most all of its muscle mass and I am in severe pain. Please help. I had also sent several sick-call requests like this in the previous few weeks and I have not had a sick-call callout. Why is there no sick call? This is very, very important that this is addressed.

Exhibit M-7:

TRULINCS  50113086 - GRIFFIN, RONNIE DOYLE - Unit: SET-D-B

-------------------------------------------------------------------------------------------

FROM: Warden
TO: 50113086
SUBJECT: RE:***Inmate to Staff Message***
DATE: 08/28/2023 07:17:02 AM

This is in response to your Inmate Request to Staff regarding Health Serivces.

Communication has been made with the Health Services Administrator and the Assistant Health Services Administrator in order to note your concern.

---

From: ~^I GRIFFIN, ~^IRONNIE DOYLE <50113086@inmatemessage.com>
Sent: Thursday, August 24, 2023 11:57 AM
Subject: ***Request to Staff*** GRIFFIN, RONNIE, Reg# 50113086, SET-D-B

To:
Inmate Work Assignment: N/A

Hello Warden Barron,

Thank you for being responsive to my last message about my diabetic foot ulcer and the issues I have had with filing grievances.

Unfortunately, there are 2 other issues that I have had similar problems getting medical care for and filing grievances with. On 7/18/23, I submitted 2 BP-9s to Unit Manager Lavatai; one concerning a pinched nerve from a dislocated shoulder which has resulted in the complete loss of use of my right (dominant) hand, and one concerning my abdominal aortic aneurism, a very serious heart condition. I have never gotten receipts from unit team or response due-dates for those BP-9s. I have inquired to both Lavatai and Smith about where they are and neither of them apparently know where my BP-9s are. It seems that there is nothing I can do at this point to go through the administrative remedy process. I had exhibits and my original BP-8 response with the BP-9s that I gave to Lavatai. I should not have to resubmit grievance forms.

Please do what you can to see to it that I get response on these grievances soon. I will resubmit if I have to, but at least I should be able to only resubmit the BP-9s and not start over with BP-8s. Thank you for reading.

**Exhibit M-8:**

## TRULINCS 50113086 - GRIFFIN, RONNIE DOYLE - Unit: SET-D-B

-------------------------------------------------------------------------------------------------

FROM: 50113086
TO:
SUBJECT: Exhibit 9-1-(Continuation Page)
DATE: 09/03/2023 06:07:18 PM

I am requesting adequate medical care and further assessment for my recently dislocated right shoulder which caused a pinched nerve, and from which I have since lost all use of my right hand. This issue is extremely painful. I want restored use of my hand. In the response to my BP-9, Posalski said there is no documentation on record of such an injury, nor has there been any mention of it on any of my encounters with medical since. (See attached BP-8 response). However, this is not true. I have spoken to the physician Dr. Dy about it numerous times, as well as every pill line nurse, including Egelston, Durano, Cruz, Satalino, and Pederson.

After the incident on 04/01/23, I called for help. The night watch count crew, officer Wilson and officer Sanchez, contacted a lieutenant and the lieutenant told them to tell me to get comfortable because there was nothing they could do until tomorrow. But after that nothing happened. I put my arm back in the socket just before dinner time the next day, 04/02/23. I have been mentioning this to pill line staff since and every time I see Dr. Dy.

Also, I have mentioned this in numerous copouts to medical staff, unit team, and the Warden. (See Exhibits 9-2 for one early example among many copouts). The Warden said he had notified Health Services of this issue on 05/08/23. (See exhibit 9-3). I have received no relief. I have no use of my right hand at all. My forearm has completely atrophied in this time. Rather than never mentioning it, I have been ignored.

In late May, I submitted a BP-8 on this issue but this BP-8 was lost. (See Exhibit 9-4). In late June, I resubmitted a BP-8 and on 7/18/23 I submitted a BP-9 (initial attempt) on this issue to Unit Maganer Lavatai. Neither Lavatai nor Unit Counselor Smith know where my intial BP-9 on this issue is. However, I never received a reponse. I have sent copouts concerning the now lost first BP-9. (See Exhibit 9-5). Smith has since told me to resubmit a BP-9 on this issue. I have also continued to send numerous sick-call requests and copouts to Health Services concerning this issue and still I have received no treatment for this issue. (See Exhibit 9-6 for a recent copout on this issue).

I am still in continual pain. I am afraid that I am going to lose use of my right hand permanently. After 7 weeks of no response on the initial attempt to file and being told by staff to re-submit, I am now re-submitting this BP-9 in the hopes that it will be properly filed and responded to.

Exhibit M-9:

TRULINCS 50113086 - GRIFFIN, RONNIE DOYLE - Unit: SET-D-B

-----------------------------------------------------------------------------------------------

FROM: 50113086
TO:
SUBJECT: Exhibit 9-1-(Continuation Page)
DATE: 09/03/2023 06:07:43 PM

I am requesting further evaluation, care, and heart surgery because I have an abdominal aortic aneurism. I was told by doctors at Stafford Creek Correctional Center that I will die if this is not treated. On 06/23/23, I signed two waivers provided by Dr. Dy so she could have access to medical records; Stafford Creek, and Gray's Harbor Hospital. I still do not have access to these records, and neither does my attorney, dispite requests from my attorney to the BOP.

Posalski responded to my BP-8 saying that I did not mention this issue during intake screening on 03/23/23, nor during any of my encounters since, and that he placed me on the list for sick call to discuss this issue. (See attached BP-8 response). Although I welcome a new appointment, I have already spoken with the physician Dr. Dy about this issue multiple times, as well as other medical staff. Of course I had mentioned to Dr. Dy when she had me sign the waiver for my records at Stafford Creek because that's the reason I have interest in having those records. But even before that I have mentioned my abdominal aortic aneurism in multiple copouts. (See Exhibit 9-2 for one early example of a copout on this issue). In a copout on 05/07/23, I brought my heart issues to the Warden's attention who responded on 05/08/23 stating that "[c]ommunication has been made with the Acting Health Services Administrator in order to address your concern accordingly." (See Exhibit 9-3).

On 07/01/23, I was urgently sent by FDC staff to Harborview Medical Center. During morning pill line, I told Nurse Egelston that I was experiencing intense chest pains, shortness of breath, and feelings of anxiety. I was first taken to FDC's Health Services Department where I was EKG tested and the EKG readings were not normal. The Ambulance personnel also performed EKG tests and said the results were not normal.

Harborview Medical personnel also performed EKG tests and said that I needed a CT scan promptly. Harborview's CT scan showed that there was something wrong but personnel could not confirm what it was. When I returned to the FDC, Pederson read the paperwork from the Harborview and told me that he was going to start me on the medication Nitro because he was not happy with Harborview's findings. I have since received Nitro, and am receiving it at a once per month basis.

After a BP-8 submitted in late May on this issue was lost, (See Exhibit 9-4), I re-submitted a BP-8 in late June, and on 7/18/23, I made an initial attempt to file a BP-9 on this issue to Unit Manager Lavatai. I never received a response. I submitted copouts inquiring about my now lost first BP-9. (See Exhibit 9-5). Neither Lavatai nor Unit Counselor Smith know where my BP-9 is. I was told by Smith to just resubmit the BP-9s.

Since I am pending further assessment and care in this extremely serious and urgent issue, and since it has been 7 weeks since the intial attempt with no response and I have been told by staff to re-submit, I am re-filing this BP-9 to continue the grievance process. I would like a response and remedy.

# Detainees grow desperate in struggle to get health care



KAREN DUCEY / THE SEATTLE TIMES

*Wayne Lankhaar looks out a window at home in Lynden, Whatcom County. While at the federal detention center in SeaTac, Lankhaar tried in vain to see a doctor. Shortly after he was released, he discovered he had terminal cancer.*

## SEATAC | Federal detention center acknowledges chronic medical staffing shortages.

**By NINA SHAPIRO**
*Seattle Times staff reporter*

Wayne Lankhaar felt like he was dying.

Pain in his abdomen made him fall to his knees and brought tears to his eyes. An alarming amount of blood came out when he went to the bathroom. He could barely eat.

Yet no matter how hard he tried, Lankhaar, incarcerated at the federal detention center in SeaTac, couldn't see a doctor. The facility, which holds pre- and post-trial defendants facing federal criminal charges, didn't have one available, he said he was told in response to near-daily requests.

*The federal detention center in SeaTac is severely understaffed when it comes to correctional officer and health care staff positions. Eight of the 19 health care positions are vacant.*

KAREN DUCEY / THE SEATTLE TIMES

His lawyer, David Hammerstad, emailed officials four times with urgent appeals, warning the institution's "indifference" to Lankhaar's medical needs was "courting legal liability."

After two months, a court order released Lankhaar in fall 2022 to a drug-treatment center while awaiting trial on charges of drug possession with intent to distribute. Waiting for a meal there, he collapsed, was taken to the emergency room and was diagnosed with terminal colon cancer that had spread to his lungs.

Now undergoing chemotherapy at a Bellingham hospital, the 62-year-old said of the

See > CARE, A10

# NORTHWEST

## ‹ Care
### FROM A1

detention center: "I know for certain I would have died if I had been there even a few days longer."

Like state and county governments maintaining jails and prisons, the federal government is legally responsible for the health care of people in its custody. Violations of that duty can be deemed "cruel and unusual punishment" and therefore unconstitutional.

A sentence of, say, five years means the loss of liberty for that amount of time, said Dr. Marc Stern, a former health official with the state corrections department and a consultant for federal agencies. "The sentence doesn't include that you're going to lose your life."

But many held at the SeaTac detention center fear exactly that. Interviews and written statements from more than 20 people currently or formerly incarcerated there, accounts from lawyers and court records and other documents indicate medical care is severely lacking, leaving serious health conditions undiagnosed and untreated.

In one case, U.S. District Judge Richard Jones weighed in. "This man needs medical care and treatment now," Jones said of Chris Frick, whom the judge temporarily released so the pretrial defendant could attend to several painful health conditions. At the detention center, Jones said, there was a "complete absence of any specific care and treatment."

The Federal Bureau of Prisons declined an interview but said in a statement that all of its facilities provide "essential medical, dental; and mental health services in a manner consis-



KARIN DUCEY / THE SEATTLE TIMES

Wayne Lankhaar, left, and his lawyer, David Hammerstad, leave the federal courthouse in Seattle after a hearing on release conditions. Hammerstad sent repeated urgent requests for medical care on behalf of his client when he was held at the federal detention center in SeaTac.



COURTESY OF NANCY RICHARDSON, 2018

Luke Thornhill was incarcerated at the SeaTac federal detention center, where he suffered from agonizing stomach pain and feared he had cancer.

practitioner.

The medical staffing woes are part of the bureau's larger recruiting and retention problem, exacerbated by burnout from the pandemic. Correctional officers are in especially short supply,

According to a 2022 audit of its contracts with one medical service provider, "the BOP did not have a reliable, consistent process in place to evaluate timeliness or quality of inmate healthcare."

### Common denominator:

Chris Frick takes his blood pressure at his home. Now that he has pleaded guilty to a drug charge, he worries about what it will mean to go back to federal prison.

KARIN DUCEY / THE SEATTLE TIMES

cervical cancer grew terminal while she was incarcerated in Gig Harbor.

But several people said their medical experiences

tears ran down his cheeks."

It was unbearable, Frick confirmed in an interview. He said he saw a dentist twice while incarcerated but was told he needed to see an outside specialist. "Well, months and months and months go by," Frick said.

He also said he was taken to an outside health system for a colonoscopy to address his gastrointestinal problems. The night before, he was put in a segregation unit to go through the unpleasant pre-procedure routine of taking fluids that flush out the system.

But when Frick arrived for the procedure, the provider told him it couldn't be done because detention center officials hadn't sent his medical records.

In the shape Frick was in, Olson said she and a colleague couldn't effectively discuss strategy with him, and they couldn't fathom putting him on the stand. Arguing that his right to a fair trial was being compromised, they asked for his release.

Opposing the motion, federal prosecutors pointed out that Frick's longstanding Crohn's condition didn't stop him from allegedly distributing drugs, including fentanyl, and previous drug-dealing for which he served a six-year sentence.

At a court hearing in December 2022, Assistant U.S. Attorney Casey Conzatti said Frick recently had a tooth extracted to comply with a judge's order. "He is being seen," Conzatti said, noting, "I understand it's probably not at the speed and pace he would like."

Kevin Posalski, a SeaTac health services administrator, added that Frick had seen a nurse practitioner and received a steroid to ease Crohn's-related inflammation. Frick was also sched-

but the need for another colonoscopy in three to five years.

"The standard of care would be to tell the patient

services in a manner consistent with accepted community standards for a correctional environment."

"All incarcerated individuals have daily access to medical care and appointments, and medical staff conduct daily rounds throughout each facility," the statement continued.

"By 'daily rounds," a spokesperson made clear, the bureau means what incarcerated people call "pill lines," in which nurses dispense medication and collect requests to be seen.

While the agency defends its health care, it also acknowledges chronic medical staffing shortages, largely due to uncompetitive pay. A decade ago, a dozen of its institutions had a medical staffing level of 71% or below. A former bureau health official called that a "crisis level," according to a 2016 report by the Department of Justice's Office of Inspector General.

The situation is now even worse at the SeaTac facility, with eight of 19 health care positions vacant, amounting to a 58% staffing level. The institution supplements its full-time staff with five contracted health care employees. For all but a full-time contracted pharmacist, the bureau declined to supply the number of hours they work.

The agency's SeaTac employees include one doctor to serve nearly 800 people. Two full-time registered nurses also work there, as does one contracted nurse

in especially short supply, with a 50% staffing level in SeaTac as of late last year. Union officials and other employees say the stifled or existing staff is left to do work that is worsening conditions — documented medical care is exhausting and dangerous.

Stressing the point, 17 Congress members, including Rep. Adam Smith, the Bellevue Democrat, wrote to the Justice Department in late January urging more oversight. Leading U.S. Senate Justice Committee members have asked for the same, specifically calling out inadequate medical care highlighted in a national NPR investigation last fall.

The Inspector General's office has noted that low medical staffing can contribute to volatility among those incarcerated, raising prison safety concerns.

Last month, someone incarcerated at SeaTac assaulted two employees. The bureau said they didn't require medical treatment and would give no further details pending ongoing investigations.

To some extent, the bureau's hands may be tied by the federal government's pay scale. But the 2016 Inspector general's report determined the agency had failed to develop a plan that prioritizes vacancies and makes better use of the U.S. Public Health Service, whose medical professionals work for a variety of federal agencies.

At the moment, the bureau might not even realize exactly where it's going wrong.

### Common denominator: desperation

Over the past year, a dozen women said during at the same time, they can face agonizing uncertainty without a diagnosis. Luke Thornhill, for instance, worried he had untreated colon cancer.

While previously serving time in an Idaho state prison, he was sent for a colonoscopy. Before seeing a doctor who could interpret lab results from two growths biopsied during the procedure, he was transferred to SeaTac on a federal drug possession with intent to distribute conviction.

Five months later, in January, he was still waiting to hear if the growths were malignant, and he was suffering from intense stomach pangs. He said he hadn't seen a doctor at the detention center, beyond an initial screening.

"I am experiencing extreme pain," he wrote in one request to be seen after four months at SeaTac. "Please help," he said in another.

Stern, the previous state corrections health official, reviewed Thornhill's biopsy results at The Seattle Times' request, finding they showed a precancerous growth that presented no immediate risk

One woman said she was left bleeding on the concrete floor after falling from a top bunk. Another said she could see a psychiatrist only every three to four months because the provider was available just one day a week. Many discussed failing to receive medications they had been taking before entering the facility, worsening conditions like heart failure or seizure disorders.

"I am continuously told they are short-staffed and to be patient," wrote one woman who said she couldn't get medications. "I'm so scared if I have a heart attack, I'll die here."

At the time several were writing, they said there was no pharmacist on site. A pharmacist position still stands vacant, though a bureau spokesperson, pointing to the agency's contracted pharmacist, said "medications are filled daily."

Complaints about health care proliferate in state prisons and county jails too. Last month, Washington paid nearly $10 million in a settlement with a woman whose

their medical experiences while incarcerated in SeaTac were worse than at county or state jails, which they say had no better conditions, even one woman saying she wouldn't risk what the had thought had been a state prison's bad health care as "five star."

Some may exaggerate their illnesses in hopes of getting attention and may not be as sick as they fear. At

would be to tell the patient all this," said Stern, also a University of Washington assistant professor.

As for Thornhill's stomach pain, he said that was likely a separate problem requiring an exam to diagnose. Depending on the severity of pain, Stern said, a reasonable amount of time to wait for a doctor's appointment is anywhere from a few minutes to a few days — but definitely not five months.

Such stories "go on and on and on," said Paula Olson, who sometimes serves as a court-appointed federal defense attorney.

One client in particular, Frick, stands out. The 50-year-old suffers from Crohn's disease, a bowel condition that causes digestive tract inflammation.

Detained at SeaTac in 2021 while awaiting trial on a charge of drug possession with intent to distribute, Frick's abdomen became so swollen and painful that he couldn't sit without slouching. He had diarrhea that caused him to go to the bathroom as often as 13 times a day, but he didn't get enough toilet paper and "was told to use a shirt if he runs out," according to a court document Olson submitted.

On top of that, Frick had a broken tooth with an exposed nerve. During a visit with her client, Olson wrote in a declaration to the court, "he would speak a few words and then stop, put a hand on his mouth until the pain spasm passed. At one point, the pain was so sharp that

uled for a doctor's visit but refused to be seen, Posalski said. (Frick said when interviewed that he ended the visit because the doctor asserted there was nothing wrong.)

The judge was unimpressed. After months of hearings, Jones said he was at a loss to understand why officials hadn't done more to address Frick's medical problems — or at least created a concrete treatment plan.

"Mr. Frick may be suffering from something that is far more complicated than anyone knows at the federal detention center," Jones said as he ordered the defendant's release.

Since then, Frick has seen an array of doctors, in part because he had a heart attack shortly after his release. He has also sued detention center officials for what he claims is indifference to his medical needs.

And he's pleaded guilty to the pending drug charge, which will likely mean going back to federal prison for 10 years unless he can get a judge to lower his sentence because of his medical conditions.

The prospect is daunting.

"There's no guarantee I'm going to come out of prison this time," he said.

Nina Shapiro: 206-464-3303 or nshapiro@seattletimes.com.

This coverage is partially underwritten by Microsoft Philanthropies. The Seattle Times maintains editorial control over this and all its coverage.

 Outlook

---

## Fw: 08ba0770-7d4a-465f-a713-317cd5fa63a4

---

From BTF-InmateToDental (BOP) <BTF-InmateToDental@bop.gov>
Date Tue 4/22/2025 12:47 PM
To    BTF-MedicalRecords-S (BOP) <BTF-MedicalRecords-S@bop.gov>

---

From: BTF-InmateToDental (BOP) <BTF-InmateToDental@bop.gov>
Sent: Tuesday, April 22, 2025 4:47 PM
To: ~^l GRIFFIN, ~^IRONNIE <50113086@inmatemessage.com>
Subject: 08ba0770-7d4a-465f-a713-317cd5fa63a4

Your name has been placed on the National Routine Dental Treatment List. Your name will be placed on the call-out when your name is reached on the waiting list. Your first appointment will be for a dental cleaning and comprehensive exam. Dental cleanings and routine fillings are considered non-emergency care and are provided as resources of staff, time and material are available. However, this list changes daily with inmates arriving from other Federal Bureau of Prisons and departing to other Federal Bureau of Prisons. Your status can/will change.

---

From: ~^l GRIFFIN, ~^IRONNIE <50113086@inmatemessage.com>
Sent: Monday, April 21, 2025 1:18 PM
Subject: ***Request to Staff*** GRIFFIN, RONNIE, Reg# 50113086, BTF-O-A

To: doc.
Inmate Work Assignment: n/a

***ATTENTION***

Please cut and paste the message indicator below into the subject line; only this indicator can be in the subject line.
08ba0770-7d4a-465f-a713-317cd5fa63a4
Your response must come from the departmental mail box. Responses from personal mailboxes WILL NOT be delivered to the inmate.

***Inmate Message Below***

Could i be plced on the the waiting list,,,,i have only 5 teeth left and i really need the teeth that are in my mouth pulled and be fitted for densureds,,,,,please and thank you

<u>Exhibit P1:</u>

## TRULINCS 50113086 - GRIFFIN, RONNIE - Unit: BTF-O-A

---------------------------------------------------------------------------------------

FROM: Stephens, Jeffrey
TO: 50113086
SUBJECT: Letter of Support for CR/RIS
DATE: 12/29/2025 02:21:01 AM

To whom it may concern,

I was confined with Mr. Ronnie Griffin in Unit DB of Federal Detention Center SeaTac (FDC) from Early April, 2023 until November of that same year when he was transferred to another unit. Through that time, I witnessed total disregard and failure by FDC staff in treating Mr. Griffin from the medical conditions which he suffers from. Mr. Griffin and I became friends during this time, and he was always able to help lighten my spirit when I needed someone to, despite the uncertainty he was facing in his life and his severe medical needs which were not being met. Mr. Griffin was sentenced for the crimes he committed, but his sentence did not include abject medical neglect; an extrajudicial punishment that no one deserves, and which I saw firsthand.

In the first week that Mr. Griffin was in my unit, he dislocated his shoulder. I remember talking to him shortly after this had happened. He had asked the guards for medical attention the very same night, but no attention was given. I thought that this was completely unacceptable that he couldn't even be seen for sick call, but I couldn't imagine that he would never receive care for this injury even over months and into years while at the FDC. But this is what happened. Over the following months, because of a pinched nerve following his injury, I saw his right arm deteriorate and atrophy, and the use of his dominant hand vanish. Seemingly no effort was to fix his shoulder and atrophy.

Horrified, I encouraged him, even nearly forced him to continue to send electronic messages to medical staff, to administrative staff, and to confront staff in person at every opportunity. And he did.. He sent copout after copout, grievance after grievance, and confronted staff week after week, month after month. We soon found that the administrative remedy program at FDC SeaTac was entirely dysfunctional. Informal and formal grievances were almost never responded to; they were often "lost." Many times, I went with him to grieve to staff. From what I understand, he may now have lost use of his dominant hand permanently.

And that was not the only medical claim that he suffered from, that truly required immediate care, and which was a severe danger to his wellbeing. Mr. Griffin also suffered from diabetic foot ulcer that received scant care, visibly worsened, and from what I understand eventually to some amputation, with a risk still of further amputation. The ulcer grew in size over the months that Mr. Griffin was in the unit. He had showed me, and everyone else who would listen, how it was getting worse over time. By August, 2023 it had still continued to enlarge up to the size of a nickel coin, increasing infected and discolored. It wasn't until some 8 months after he arrived that he was finally provided an outside care appointment for an initial assessment in; a pace that continued and has so far led to one amputation.

On top of that, Mr. Griffin also suffered from heart issues, an abdominal aortic aneurism. Like the above, I saw and encouraged him to continually press staff, and close to nothing was done. Mr. Griffin had told me that a previous provider had told me that this condition will kill him if it's not dealt with. However, that did not spur action from FDC Staff. The first care he received from heart related care was when he was rushed to the hospital in early July, 2023 for shortness of breath and chest pain. When he returned, he was started on nitroglycerin. I don't believe he was ever treated for his heart issues beyond assessments. Mr. Griffin later told me that he was told by doctors at FMC Butner that he is in atrial fibrillation at all times and still has not received any substantive treatment to address or improve his conditions.

I was not with Mr. Griffin in other units at the FDC or at Butner, but from what I am told, in general, he has continued to receive inadequate care.

Mr. Griffin deserves a chance to seek medical care beyond the confines of the Bureau of Prisons which has failed in its duty to provide him care. He has already suffered permanent damage to his health and wellbeing and is on track to suffer more; a penalty not found in his sentencing order. In making your decision, please consider the fact that Mr. Griffin may only have so many years left to live given his conditions, making the undue damage he's suffered from inadequate care in the BOP all the more tragic and significant.

Thank you for reading and for your consideration.

Sincerely, a friend of Mr. Ronnie Griffin,
Jeffrey Stephens

Exhibit Q-1:

**U.S. Department of Justice**
**Federal Bureau of Prisons**
Federal Correctional Complex
*Butner, North Carolina 27509*

January 13, 2026

MEMORANDUM FOR WHOM IT MAY CONCERN

FROM:        D. Jarvis, Unit Manager

SUBJECT:     REDUCTION IN SENTENCE
             I/M GRIFFIN, RONNIE #50113-086

I received the reduction in sentence packet on December 1st, 2025 from inmate Griffin, Ronnie. I then sent the packet on December 2nd 2025 to the medical department. I have not received a response from the medical department as of this date.

cc: Front Lobby
Control

AFFIDAVIT OF SERVICE



FILED
LODGED
RECEIVED    **MAIL**

JAN 29 2026

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY                    DEPUTY

The Defendant-Movant, _Ronnie Griffin_ , pro se,

hereby swears under the penalty of perjury, 28 U.S.C. Section 1746, that

he has served the persons/entities below with a copy of the foregoing

pleading, to include any attachments, by placing such in a First-Class,

postage prepaid envelope, and depositing such in the U.S. Mail on this.

_20_ day of _January_ , 20_26_ to effect delivery

and service in accordance with the law.


Served Upon:


_CLERK OF U.S. District Court_      _This being Package 2 of 2:_
_700 Stewart Street_               _Exhibits Only:_
_Room 6301_
_Seattle, Washington_             _Case # 3:23-cR-5085-DGE-21_
_98101-1271_                      _Compassionate Release_


Signature Of The Affiant
Ronnie Griffin # 50113-086


[ ]  If checked, this box indicate service was effected utilizing the U.S.
     Postal Service's Certified Mailing Procedures and service was effected
     via Certified Receipt No:

_____



Rotulie Griffin  # 50113-086
U.S. Department of Justice
Federal Bureau of Prisons
*Federal Correctional Complex*
*Butner, North Carolina 27509*
☐ Federal Medical Center
   P.O. Box 1600
☒ Federal Correctional Institution II
   P.O. Box 1500
☐ Federal Correctional Institution
   P.O. Box 1000
☐ Low Security Correctional Institution
   P.O. Box 999

Official Business

Legal Mail:
Package 2 of 2:

Clerk of the U.S. District Court
700 Stewart Street
Room 6301
Seattle, Washington
                          98101-1271

FILED
LODGED
RECEIVED

MAIL

JAN 29 2026

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY                       DEPUTY

UNITED STATES POSTAL SERVICE.                    Retail

**G**    US POSTAGE PAID
         **$0.00**    Origin: 27509
                      01/21/26
                      3611040518-91

**USPS GROUND ADVANTAGE®**

1 Lb 0.80 Oz
**RDC 01**

C028

SHIP TO:
STE 6301
700 STEWART ST
SEATTLE WA 98101-4441

**USPS TRACKING® #**

9534 6127 2692 6021 5942 26



FEDERAL CORRECTIONAL INST. #2
P.O. BOX 1500
BUTNER, NORTH CAROLINA 27509

DATE: 1/20/26

"SPECIAL/LEGAL MAIL"

The enclosed letter was processed through special mailing procedures for forwarding to you. The letter has been neither opened or inspected. If the writer raises a question or problem over which this facility has jurisdiction, you may wish to return the material for further information or clarification. If the writer enclosed correspondence for forwarding to another addressee, please return the enclosed to the above address.